UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN MICHAEL NEUMANN,

             Petitioner,                       Civil Action No. 15-CV-11995

vs.                                     HON. MARK A. GOLDSMITH

JULIE ANNE NEUMANN,

             Respondent.

_____/

## OPINION AND ORDER GRANTING IN PART PETITION FOR RETURN OF CHILDREN UNDER THE HAGUE CONVENTION (Dkt. 1)

Family legal disputes rarely find their way into federal courts. This case presents one exception to that general rule: a petition by one parent for return of minor children to their country of habitual residence, from which they had been taken by their other parent. This case is brought pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, which has been implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, et seq.

Petitioner Steven Neumann seeks the return to Mexico of three minor children — JMN, JSN, and MKN — who are the issue of his marriage to Respondent Julie Neumann. See Compl. (Dkt. 1). Julie vigorously opposes the children's return. While she raises troubling allegations touching on Steven's fitness as a parent, this Court's role under the Convention is not to determine which custodial arrangements would effectuate the best interests of the children. Rather, the exclusive mission is to find whether the children were wrongfully removed from their country of habitual residence and, if so, whether certain limited affirmative defenses have been made out, so as to permit the children to remain in the United States. Having conducted a four-day-long evidentiary hearing, and having interviewed the children in camera, the Court

1

concludes that the Convention requires the return of two of the minor children, JSN and MKN, to Mexico. Thereafter, another court must make the very difficult decision about appropriate custody arrangements.[1]

## I. BACKGROUND[2]

Julie and Steven were married in 1997. Tr. Vol. 1 19:4-19:5 (Dkt. 44). Three children were borne from their marriage: a daughter, JMN (born 1999, now 16); and two sons, JSN (born 2002, now 14), and MKN (born 2003, now 13). Id. 19:6-19:12. In February 2011, the Neumann family moved to Mexico upon Steven taking an assignment in Mexico City from his employer, Ford Motor Company. Id. 19:13-20:8. The family lived together in Mexico until late December 2014. On December 26, 2014, there was an explosive domestic dispute in the Neumann home, fueled in part by excessive consumption of alcohol by Steven, an admitted alcoholic. Id. 60:22-60:23; Haynes Report at 10. Julie immediately removed the children from the home and two days later, on December 28, 2014, she and the children boarded a plane and left Mexico for the United States, eventually arriving in Michigan to stay with her family. Tr. Vol. 2 58:24-59:2, 116:14-117:9 (Dkt. 45).

Steven filed a complaint for divorce in Mexico on May 11, 2015. Tr. Vol. 1 31:20-31:22. The next day Julie filed a complaint for divorce in Michigan's Wayne County Circuit Court. Id. 31:23-31:25. In June 2015, Steven filed a petition in this Court for the return of all three children pursuant to the Hague Convention. The Court entered a temporary restraining order preventing

---

[1] Prior to the evidentiary hearing, JMN turned 16 years old. Tr. Vol. 1 19:9-19:10 (Dkt. 44). The Hague Convention "cease[s] to apply when the child attains the age of 16 years." Hague Convention, art. 4. Accordingly, only the two younger children, JSN and MKN, are the subject of the current petition.

[2] This Background presents the basic (and essentially undisputed) facts leading up to the removal of the children and any subsequent salient procedural history. The Court will make additional findings of fact as necessary below, in the Analysis section, in conjunction with its discussion of the law under the Convention.

Julie from removing the children from the state of Michigan.  6/3/2015 Op. & Order (Dkt. 4).  At the parties' urging, the Court appointed a child psychologist to offer opinions to the Court on certain issues.  Dr. Jack Haynes, Ph.D., was selected to evaluate all five members of the Neumann family and offer opinions on three issues: (i) the extent to which the minor children could each make a mature decision about returning to Mexico; (ii) whether requiring the children to return to Mexico would pose a grave risk that they would be exposed to physical or psychological harm; and (iii) the validity of the views expressed in a report concerning the well-being of the children submitted by social worker Chuck Snyder, LMSW, in connection with the Wayne County Circuit Court divorce case filed by Julie.  6/19/2015 Order (Dkt. 16).

While Dr. Haynes conducted his evaluation, the parties engaged in several months of discovery.  The parties also engaged in facilitation, in an effort to resolve their differences outside the courtroom.  After these efforts proved unsuccessful, the Court conducted a four-day evidentiary hearing.  Upon completion of the hearing, the Court spoke with each of the children individually, in chambers and with only a law clerk present.  The Court then invited the parties to submit proposed findings of fact and conclusions of law, which it has considered in addition to the evidence presented at the hearing and the information gleaned from its conversations with the children.

## II. ANALYSIS

The Hague Convention is a coordinated international response to the jurisdictional problem presented when one parent, often in the course of a domestic dispute, deprives the other parent of custodial rights over shared children, by either fleeing with the children to take refuge in another country, or by retaining the children in one country contrary to prior agreement of the parents.  See generally 22 U.S.C. § 9001.  The twin aims of the Convention are to secure the

prompt return of any child either wrongfully removed or retained, and to ensure that the rights of custody and access recognized in one contracting country are respected in all other contracting countries.  See Hague Convention, art. 1; 22 U.S.C. § 9001.  Importantly, the Court's jurisdiction is limited to determining the merits of the abduction claim.  Friedrich v. Friedrich ("Friedrich II"), 78 F.3d 1060, 1063-1064 (6th Cir. 1996).  The Court may not adjudicate the merits of any underlying custody dispute; this would run counter to the Convention's purpose of deterring parents from crossing borders in search of a more sympathetic court.  Id.

Removal of a child is "wrongful" when it is in breach of a parent's custodial rights under the laws of the country in which the child was "habitually resident" at the time of the removal, and the parent was exercising those rights at the time of removal or would have been exercising them but for the removal.  Hague Convention, art. 3; see also Friedrich II, 78 F.3d at 1064.[3]  As the petitioning party, Steven must demonstrate by a preponderance of the evidence that the children's removal from Mexico was wrongful.  22 U.S.C. § 9003(e)(1)(A); Simcox v. Simcox, 511 F.3d 594, 602 (6th Cir. 2007).

However, even if the removal was wrongful, the Court is not necessarily bound to order return of the children.  The Convention articulates certain exceptions, three of which Julie raises here: (i) the petitioning party had consented to or subsequently acquiesced in the removal; (ii) the

---

[3] The full provision is as follows:

> The removal or the retention of a child is to be considered wrongful where –
> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3.

child objects to the return and is of a sufficient age and degree of maturity that it is appropriate to take account of the child's views; and (iii) there is a grave risk that returning the child would expose the child to physical or psychological harm. Hague Convention, art. 13. The first two need only be established by a preponderance of the evidence; the third requires clear and convincing evidence. 22 U.S.C. § 9003(e)(2); Simcox, 511 F.3d at 603-604.

### A. Prima Facie Case

#### 1. Country of Habitual Residence

"Habitual residence" is not defined in the Convention. However, this Circuit has determined that a child's country of habitual residence "is the nation where, at the time of their removal, the child has been present long enough to allow acclimatization, and where this presence has a 'degree of settled purpose from the child's perspective.'" Robert v. Tesson, 507 F.3d 981, 993 (6th Cir. 2007) (quoting approvingly Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir. 1995)). The emphasis of the inquiry is "on the child, not the parents, and examine[s] past experience, not future intentions." Id. (quoting Friedrich v. Friedrich ("Friedrich I"), 983 F.2d 1396, 1401 (6th Cir. 1993)).

The Neumann family moved to Mexico in February 2011 upon Steven accepting a three-year assignment in Mexico City from his employer, Ford. Tr. Vol. 2 110:7-110:18. Steven's contract was renewed in 2014, through 2017. Id. 139:20-140:6. The family resided continuously in Mexico from that point until the children's removal in late December 2014. While residing in Mexico, the children attended Greengates School, a private international institution, the tuition for which was paid for by Ford. Tr. Vol. 1 20:9-20:24. All three children were engaged in extracurricular activities — including sports, concerts, plays, and student government — and maintained friendships. Id. 20:13-20:17; Tr. Vol. 2 22:5-22:23; Haynes Report at 37.

Almost four years in Mexico is sufficient to render Mexico the children's country of habitual residence.   Indicators suggestive of acclimatization include social engagements, participation in sports programs and other excursions, meaningful connections with people and places — and most especially — academic activities, which are "among 'the most central . . . in a child's life.'"   Robert, 507 F.3d at 996 (quoting Karkkainen v. Kovalchuk, 445 F.3d 280, 293 (3d Cir. 2006)).   All such indicators were in place in Mexico.   Moreover, even though the Mexico assignment was a temporary one, Mexico was, both at the time of removal and for some years prior, the exclusive site of the children's day-to-day lives and experiences.   It was in Mexico where the Neumanns maintained a home and a majority of their belongings, including two family dogs.

While it is true that the children returned to Michigan every summer for approximately four to six weeks, these return trips are more aptly characterized as summer vacations, which are commonly spent away from a family's place of residence.  Tr. Vol. 1 95:10-95:20.  And the fact that the children retained meaningful connections with both people and places in Michigan, Resp't Proposed Findings of Fact & Conclusions of Law at 2 (Dkt. 50), does not somehow detract from their daily lives and experiences in Mexico.   While Julie stresses that there was no settled intent to remain in Mexico permanently, id. at 3, this argument ignores that the Sixth Circuit has specifically rejected the notion that the parents' subjective intent should control. Robert, 507 F.3d at 990-991.[4]

---

[4] In any event, the testimony on this point does not establish a definitive intent to return to Michigan upon completion of Steven's present three-year contract.  Julie testified that there were numerous conversations between her and Steven about relocating to other places, including China.  Tr. Vol. 2 112:5-112:24, 139:13-140:25.  She testified that she had decided to defer making any decision on a possible move until the contract was actually up and, therefore, no agreement was ever reached with Steven.  Id.

Indeed, the Robert court expressly criticized an Eleventh Circuit case, Ruiz v. Tenorio, 392 F.3d 1247 (11th Cir. 2004), for coming to the same conclusion that Julie now asks this Court to reach.  Robert, 507 F.3d at 991.  The Ruiz court considered evidence such as the family's American bank account, credit cards, and forwarding address, along with some tenuous indication that the family was considering returning to the United States, in holding that there was never a "shared intention to abandon the prior United States habitual residence and to make Mexico the habitual residence of their children."  Id.  The Sixth Circuit deplored this "subjective intent" approach, which "made seemingly easy cases hard and reached results that are questionable at best," id. (quoting Koch v. Koch, 416 F. Supp. 2d 645, 651 (E.D. Wis. 2006), aff'd, 450 F.3d 703 (7th Cir. 2006)), opining instead that, "[a] child who lives in Mexico, attends Mexican school, and makes Mexican friends for three years builds an attachment to Mexico that would lead any child to call that country 'home,'" id.  Even considering the statements offered by Julie — that the children "perceived Michigan as their home," and "were glad to be home [in Michigan]," Resp't Proposed Findings of Fact & Conclusions of Law at 3 (referring to Mr. Snyder's deposition and accompanying exhibits) — these statements appear to have been made several months after the children had returned to the United States.  The Court does not consider these statements to be reliable expressions of the children's sense of "home" at the time immediately preceding the removal.[5]

---

[5] Notably, during the Court's interview of MKN, in response to the Court's questions as to what Steven had done to make any contact between MKN and Steven "awkward," MKN responded, in part, that Steven's actions had changed his life forever; he had caused the children to move and change schools when the family was supposed to stay in Mexico for four more years.  The response reflects MKN's perception of the home in Mexico as having some "degree of settled purpose," Feder, 63 F.3d at 224, as required under the Convention.

Accordingly, Steven has demonstrated by a preponderance of the evidence that Mexico was the country of habitual residence at the time the children were removed to the United States by Julie.

### 2. Wrongful Removal

To prevail on his petition, Steven must show, not only that Mexico was the country of habitual residence, but that he was exercising his custodial rights as defined by Mexican law. "Custody rights 'may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of the State.'" Friedrich II, 78 F.3d at 1064 (quoting Hague Convention, art. 3).

At the evidentiary hearing, Maria Fernanda Garcia Toledo Alvarez, a Mexican lawyer specializing in family law who also represents Steven in the concurrent Mexican divorce proceedings, testified that parental custodial authority is exercised under Mexican law jointly by the mother and father. Tr. Vol. 1 107:19-108:20, 112:7-112:14. Alvarez further testified that both parents are entitled to continue to exercise custodial rights until a custody order has been entered concluding otherwise. Id. 122:17-123:6. There has been no evidence to contradict Alvarez's testimony. There is also no evidence of a Mexican court order restricting or otherwise modifying Steven's rights to the children. Accordingly, at the time of removal, Steven retained custodial rights to the children under Mexican law, and Julie's removal of the children breached those rights.

In response, Julie argues that Mexican law is at odds with the Convention, "because no one under any circumstances in Mexico could be found to have abandoned their custodial rights" unless a court order so provided. Resp't Proposed Findings of Fact & Conclusions of Law at 5. However, that the law of the country of habitual residence does not provide for loss of custody rights absent a court order does not contradict any provision of the Convention. Indeed, the

8

Convention requires a court to apply that country's domestic law — regardless of its content or scope — to determine whether the non-removing parent had custody rights to exercise.

That is the precise teaching of <u>Friedrich II</u>, where the removing parent challenged whether the non-removing parent was exercising custody rights under German law.  Like the law of Mexico, German law broadly confers joint custody rights to parents unless limited by judicial decree.  <u>Friedrich II</u>, 78 F.3d at 1064.  The Sixth Circuit held that the non-removing parent had not terminated his custody rights under German law when he placed the child's belongings outside the family apartment, because that action did not constitute "a judicial abrogation of custody rights."  <u>Id.</u>

While the Sixth Circuit recognized that the scope of custody rights must be determined under the law of the country of habitual residence, it also recognized that whether the non-removing parent was "exercising" his custody rights was a distinct question under the Convention.  <u>Id.</u> at 1064-1065.  As to that distinct question, the Sixth Circuit instructed that a court should "liberally find 'exercise' whenever a parent with <u>de jure</u> custody rights keeps, or seeks to keep, any sort of regular contact with his or her child."  <u>Id.</u> at 1065.  In other words, "if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute <u>clear and unequivocal abandonment of the child</u>."  <u>Id.</u> at 1066 (emphasis added).

Julie tries to meet this "clear and unequivocal abandonment" standard by arguing that: (i) Steven was not actually exercising those rights because he had no contact with the children in the two-day period after Julie took the children from the family home and before she removed them to the United States; and (ii) he was not capable of exercising his custodial rights due to his

inebriated state.  Resp't Proposed Findings of Fact & Conclusions of Law at 4-5, 17.  Julie's second argument is premised on Steven's excessive consumption of alcohol in the two days immediately after Julie and the children left the family's home, before traveling to the United States.  Tr. Vol. 1 56:21-56:25; Haynes Report at 11.

As to Julie's first point, the Court is unconvinced that Steven was not exercising his custodial rights on the theory that he had not seen or spoken with the children in the two days immediately after Julie took the children from their home following the December 26 domestic dispute.  While the Sixth Circuit defined "exercise" under the Convention with reference to a petitioning parent's attempts to maintain "any sort of regular contact with his or her child" prior to the removal, it also acknowledged that "the confusing dynamics of quarrels and informal separations make it difficult to assess adequately the acts and motivations of a parent."  Friedrich II, 78 F.3d at 1065.  The court cautioned that "[r]eading too much into a parent's behavior during these difficult times could be inaccurate and unfair."  Id. at 1065-1066.  Steven contacted Julie during the two-day period after Julie removed the children from the home, asking where they were, at least once by phone, Tr. Vol. 2 58:4-58:12, and by text message, see Pet'r Ex. 7.1 (text messages stating "Come home," and "Where are uou [sic]").

In light of the Sixth Circuit's instruction to "liberally find 'exercise'" — and given the circumstances surrounding those two days, namely, Steven's level of intoxication and the prior domestic dispute between Steven and Julie — the Court finds that Steven's conduct during the two-day period was not an act of "clear and unequivocal abandonment."  And Steven's heavily intoxicated state also fails to rise to Friedrich II's standard for failure to exercise, because "[o]nce a court determines that the petitioner exercised custody rights in any manner, the court does not consider whether the parent exercised the custody rights well or badly."  Panteleris v.

Panteleris, 601 F. App'x 345, 348 (6th Cir. 2015). This is not the "long period of unexplainable neglect of the child [that] could constitute non-exercise of otherwise valid custody rights under the Convention." Friedrich II, 78 F.3d at 1066. Moreover, there is no evidence that but-for Julie's unilateral removal of the children from the home, Steven would not have had contact with the children during those two days.[6]

Accordingly, Steven has made out a prima facie case of wrongful removal under the Convention, and the burden shifts to Julie to demonstrate why the Convention's return mandate should not apply in this case.

### B. Affirmative Defenses

#### 1. Consent and/or Acquiescence

A court may deny a petition if it finds that the petitioning party "had consented to or subsequently acquiesced in the removal or retention." Hague Convention, art. 13(a). Julie argues that Steven so consented or acquiesced, because he purportedly yelled at the children at some point during the December 26 episode to "[g]et the f---- out of my house, out of my life." Resp't Proposed Findings of Fact & Conclusions of Law at 4, 16-17.

Even assuming that Steven did exclaim at the children in that manner, the statement constitutes neither consent nor acquiescence to the children's removal from Mexico. "Each of the words and actions of a parent during the separation are not to be scrutinized for a possible

---

[6] Julie's citation to a district court's decision in Holmes v. Holmes, 887 F. Supp. 2d 755 (E.D. Mich. 2012) is not persuasive. Resp't Proposed Findings of Fact & Conclusions of Law at 16-17. There, the court held that the father was not actually exercising custody of his two-month old child at the time of the child's removal from Ireland. Holmes, 887 F. Supp. 2d at 759. However, the opinion notes that an Irish social worker and a nurse had taken the child and the mother to a safe house in Ireland, away from the allegedly abusive father. Id. It thus appears that third-parties, who may have been affiliated with Irish authorities, effectively severed the custodial connection between father and child — a circumstance not present in our case. In any event, to the extent Holmes is at odds with Friedrich II's standard of "clear and unequivocal abandonment," it cannot be followed by this Court.

waiver of custody rights." Friedrich II, 78 F.3d at 1070; see also Simcox, 511 F.3d at 603 (applying same logic to pre-abduction consent, in holding that "a single e-mail message indicating a willingness to allow the children to live with their mother in Ohio should not be the basis for a finding that Mr. Simcox consented to their removal, especially given the manner in which Mrs. Simcox removed the children"). Rather, there must be formal relinquishment or unequivocal acquiescence over a significant period. Friedrich II, 78 F.3d at 1070 ("[A]cquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." (footnotes omitted)). Under those authorities, the Court will not infer consent or acquiescence from isolated and heated statements made in the course of what appears to be an alcohol-fueled domestic dispute.

### 2. Maturity of the Children

The Convention permits the Court to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [the child's] views." Hague Convention, art. 13. Courts have declined to impose a per se age-limit below which a child's objection would be disregarded or above which it would be given dispositive effect. See, e.g., Raijmakers-Eghaghe v. Haro, 131 F. Supp. 2d 953, 957 (E.D. Mich. 2011). With myriad variables at work in a child's decision-making, courts recognize that the analysis is essentially ad hoc and resistant to bright-line rules. de Silva v. Pitts, 481 F.3d 1279, 1287 (10th Cir. 2007) ("Given the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate."). Further, the parent seeking to invoke the "maturity" provision has the burden of proof by a preponderance of the evidence, Simcox, 511 F.3d at 604, and must meet

that burden in light of the principle that affirmative defenses to the Convention are narrowly construed, de Silva, 481 F.3d at 1286 (maturity exception narrowly construed).

In our case, there is a threshold question whether the preference expressed by JSN and MKN for staying in this country with their mother qualifies as an "objection" that would trigger a "maturity" analysis. Some courts have drawn a distinction between a child's expression of a "preference" to remain in a particular country and an "objection," cognizable under the Convention, to being returned to the child's country of habitual residence. In Morrison v. Dietz, No. 07-1398, 2008 WL 4280030 (W.D. La. Sept. 17, 2008), aff'd sub nom., Dietz v. Dietz, 349 F. App'x 930 (5th Cir. 2009), the court drew just such a distinction in concluding that a child's mere "preference" is appropriate for a custody determination, but not appropriate in determining whether a child should be repatriated:

> The Hague Convention also provides a limited opportunity for the child to be heard provided it has obtained an "age and degree of maturity" at which it is appropriate to take its views into account. But a main intention of this article was to draw a clear distinction between a child's objections, as defined in the article, and a child's wishes as commonly expressed in a custody case. This is logical, given that the Convention is not intended as an instrument to resolve custody disputes per se. It follows, therefore, that the notion of "objections" under Article 13b is far stronger and more restrictive than that of "wishes" in a custody case.

Id. at *13 (quoting Response to International Parental Kidnapping: Hearing Before the Sen. Comm. on Criminal Justice Oversight, (1999) (statement of Catherine L. Meyer, British Embassy Co-chair of the International Centre for Missing & Exploited Children), 1999 WL 988418 (F.D.C.H.)); see also Tsai-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259, 279 (3d Cir. 2007) (finding no clear error when a district court, in declining to apply the "maturity" exception, distinguished between "particularized objections" to return to country of habitual residence and a mere preference to remain in U.S.); Haimdas v. Haimdas, 720 F. Supp. 2d 183, 206 (E.D.N.Y.

2010) ("A child's expression of a preference to remain in the United States rather than a particularized objection to repatriation may provide a basis for a court to find the mature child exception inapplicable."), aff'd, 401 F. App'x 567 (2d Cir. 2010); Trudrung v. Trudrung, 686 F. Supp. 2d 570, 578 (M.D.N.C. 2010) ("[T]he child here has indicated more of a preference to remain in the United States rather than an objection to being returned to Germany.").

Here, JSN and MKN expressed a preference for remaining in Michigan with their mother. Yet in their interview with the Court in chambers, the children did not identify any significant concern about returning to Mexico. They pointed to certain advantages to remaining in Michigan, such as being able to walk to school and playing on their school's sports teams. But they expressed no concern that they would suffer hardship of any kind by returning to Mexico. And notably, they expressed no fear of any harm, such as physical violence or psychological distress, to which they might be subjected or exposed by their father or by anyone else. In these circumstances, the sentiments expressed by JSN and MKN amount to a heartfelt desire to stay in Michigan; but they do not amount to cognizable "objections" to being repatriated that would trigger a "maturity" analysis under the Convention. See Haimdas, 720 F. Supp. 2d at 209 (finding that child's "sincere preference" did not amount to an "unequivocal objection," thus concluding that his "viewpoint, as mature as it is, cannot be an adequate basis for this Court to 'disregard the narrowness of the age and maturity exception'" (quoting Tsai-Yi Yang, 499 F.3d at 279)).

The evidence that Julie points to as suggesting otherwise does not counsel a different conclusion. Specifically, she relies on certain statements purportedly made by the children to others — Mr. Snyder and Julie's pastor, Father Bilot — indicating that the children do have significant fears and apprehensions regarding a return to Mexico. See Resp't Proposed Findings

of Fact & Conclusions of Law at 3, 12-13.  But these statements are rather general and consist of a third-party's reflection and interpretation of the children's communications.  Further, these impressions lack sufficient support from the children directly to be given any kind of significant weight.

Dr. Haynes also observed that the children harbored "fears" and "apprehension," but many of these observations refer to the children's apprehension of meeting with their father in Michigan for the first time in several months, rather than a fear of returning to Mexico.  Haynes Report at 44 (JSN "indicated some fears of seeing his father at the present time"); id. at 49 (all three children "expressed apprehension and fears about [seeing their father] at the present time"); id. at 50 ("The children have expressed feelings of apprehension regarding reunification with their father at this time.").

Elsewhere in his reports, Dr. Haynes does assert that the children feel "unsafe," or have "significant fears" regarding a return to Mexico.  Id. at 50 ("They say they feel unsafe."); Haynes Suppl. Report at 2, 3.  However, these expressions of concern appear to be grounded in the children's concerns about their father's alcoholism and the uncertainty that it introduces into their lives if their interaction with him is not supervised — not a concern about returning to Mexico per se.  See Haynes Suppl. Report at 3.  And whether these expressions of fear are genuine is suspect, given the contrary indications in the record.  For example, when asked directly whether he was "afraid of his father," JSN responded, "not really."  Haynes Report at 42. Notably, in the Court's interviews with JSN and MKN following at least one meeting between Steven and the children, the encounter was described as "awkward" and "very emotional," but neither JSN nor MKN communicated fear or apprehension, so much as hesitance and distrust.

15

In sum, the children understandably have a complex weave of emotions relative to their father. They harbor feelings of anger and resentment traceable to the disruption of their lives that they link to his conduct on December 26. See id. at 42, 44-45. They express "fear" — but of the kind that appears based on the unpleasantness of potentially being in Steven's unsupervised custody — not a specific fear of being repatriated to Mexico. Accordingly, the Court is not persuaded that the "fears" and "apprehension" identified by Julie amount to cognizable objections under the Convention.

Even if the Court were to engage in a "maturity" analysis, the conclusion would be that the boys' opinions about remaining in Michigan should not be taken into account. Regarding their decision to remain in Michigan, Dr. Haynes opined that because of the boys' age, "[b]y definition their decisions and cognitive processes on such matters are not mature." Haynes Suppl. Report at 2.

Dr. Haynes's assessment accords with the Court's own view after speaking with JSN and MKN. While both boys presented as bright, well-behaved, and respectful, their overall demeanor and responses to the Court's questions suggested that the decision-making process underlying their opinions, and the reasons supporting their opinions, were not "mature."

The statements lacked depth and thoughtfulness, which are the hallmark of a mature decision. Specifically, the boys focused on short-term benefits, as most children do, such as walking to school, playing on sports teams, being with family, and interacting with friends that they have made. But a limited focus on such short-term advantages, without consideration of the long-term implications of repatriation, demonstrates a less than fully mature decision-making process. See, e.g., Wasniewski v. Grzelak-Johannsen, No. 5:06-CV-2548, 2007 WL 2344760, at *4-5 (N.D. Ohio Aug. 15, 2007) (maturity exception not satisfied where 13-year-old child's

16

reasons for remaining in the United States — identified as enjoying the company of his mother and maintaining current friendships — were "superficial"); Tsai-Yi Yang v. Fu-Chiang Tsui, No. 2:03-cv-1613, 2006 WL 2466095, at *16-17 (W.D. Pa. Aug. 25, 2006) (10-year-old's preference based on good school, good grades, and friendships insufficient to meet maturity exception), aff'd, 499 F.3d 259 (3d Cir. 2007); Gonzalez Locicero v. Nazor Lurashi, 321 F. Supp. 2d 295, 298 (D.P.R. 2004) (13-year-old's preference for remaining in Puerto Rico, based on good school grades and friendship, not sufficient to satisfy maturity exception).

Furthermore, the boys' statements do not evidence a canvassing of all factors that might bear on their decision, such as the educational and cultural opportunities that a life in Mexico would present to them. The failure to examine the totality of factors and the long-term implications of their choice suggests to the Court that the boys do not fully appreciate the scope, importance, and implications of the decision. See Khalip v. Khalip, No. 10-13518, 2011 WL 1882514, at *8 (E.D. Mich. May 17, 2011) (finding that the children's reasons for wanting to stay in U.S. stemmed from desire to stay in the environment to which they had become accustomed, and "their stated reasons and responses also reveal that they are not mature enough to understand the full scope of this situation in order to prevent being returned").

In addition, the boys' strikingly similar answers to the Court's questions also suggested that their answers were somewhat coordinated and rehearsed, rather than a genuine expression of their feelings. McClary v. McClary, No. 3:07-cv-0845, 2007 WL 3023563, at *12 (M.D. Tenn. Oct. 12, 2007) (child not mature, in part, because he appeared to manipulate his answers so the court would allow him to stay in the U.S.). While this aspect of their statements does not necessarily mean that it was the product of their mother's alleged coaching (as Steven contends), it leaves the Court with the impression that the decision-making does not rise to the maturity

level that would allow this Court to give weight to the children's opinions.  See Morrison, 2008 WL 4280030, at *14-15 (taking into account children's demeanor in analyzing applicability of maturity exception).

For these reasons, the Court concludes that the two youngest children are not sufficiently mature to have their preferences and/or objections granted consideration.

### 3.  Grave Risk of Harm

The Convention also grants courts the discretion to deny a petition for return when "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Hague Convention, art. 13(b).  In applying the exception, courts are admonished that it is not a "license for a court in the abducted-to country to speculate on where the child would be happiest."  Friedrich II, 78 F.3d at 1068. The "'risk to the child [must be] grave, not merely serious.'"  Id. (quoting Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494-01, 10510 (Mar. 26, 1986), 1986 WL 133056).

Here, Julie argues that there is a grave risk that returning the children to Mexico would expose them to physical or psychological harm, or otherwise place them in an intolerable situation, because of alleged domestic abuse preceding and prompting Julie and the children's flight to the United States, as well as because of Steven's alleged untreated alcoholism.  Because these two issues are interconnected, the Court addresses the evidence on each in tandem.

The evidence suggests a limited history of physical altercations between Steven and Julie. For instance, it is undisputed that Julie once extinguished a lit cigarette on Steven's bare chest. Tr. Vol. 1 40:7-40:14; Tr. Vol. 2 28:17-29:6.  Julie also testified to what she perceived as "bullying" behavior, where Steven would push Julie around by "bumping" his belly into her.  Tr. Vol. 2 28:24-29:4; see also Haynes Report at 25-26.  These incidents do not appear to have

involved alcohol consumption by either party; there is also nothing to suggest that the children were present for any of these incidents. Julie further claimed that during the 2003 Thanksgiving holiday, Steven "got real, real drunk," and while Julie was driving the entire family home from Steven's parents' house he started to punch and hit Julie over the head and scream at her; the children were in the backseat. Haynes Report at 25; Tr. Vol. 2 61:11-61:23. She reported having to return to Steven's parents' house for assistance in calming Steven down. Haynes Report at 25; Tr. Vol. 2 61:11-61:23.

The most significant altercation took place on December 26, 2014. The parties all agree that the incident occurred, although Steven and Julie dispute the specific details of the incident, including who was the initial aggressor. Compare Tr. Vol. 1 25:22-27:2, with Tr. Vol. 2 41:15-47:6. It is apparent that Steven had been consuming alcohol the previous two days, on December 24 and December 25. Tr. Vol. 1 43:3-43:7. On both of those days he reached an intoxicated state, which Julie documented on a cell phone in the form of photographs and audio recordings. Id. 25:22-26:2, 43:3-43:7; Tr. Vol. 2 36:5-37:24, 39:2-39:11.

On December 26, Julie revealed the existence of these recordings to Steven and a fight ensued over control of the phone. Tr. Vol. 1 25:22-26:11, 49:11-49:17; Tr. Vol. 2 41:15-42:10, 42:22-43:12. Julie and Steven each claim to have been struck by the other with hands and fists during this initial altercation. Tr. Vol. 1 26:8-26:11, 49:18-50:11; Tr. Vol. 2 42:22-43:12. Ultimately though, Steven was able to secure control of the phone and left the room to delete the recordings. Tr. Vol. 1 26:8-26:14; Tr. Vol. 2 43:5-44:1.

At some point thereafter, a follow-up argument ensued in the kitchen. Julie asserts that Steven engaged in a verbal tirade against JMN, and upon Julie's intervention Steven pinned Julie against the kitchen sink, holding a knife against her neck and screaming in her face. Tr. Vol. 2

19

46:7-46:23.  Steven's version of events involves Julie swinging a frying pan at his head during a verbal argument over a vodka bottle; he contends the frying pan connected on two instances.  Tr. Vol. 1 26:14-26:19.[7]  At that point, Steven asserts, he grabbed a knife and held it in front of Julie's face.  Id. 26:19-26:20.  In addition to the described physical altercation, each party attributes to the other various taunts and other verbal aggressions.  Id. 26:21-26:23; Tr. Vol. 2 46:22-47:6, 134:7-134:8.

At least two of the children were present for the incident and considerably upset by the scene.  Haynes Report at 35, 42.  Steven testified that upon hearing the children he dropped the knife and pushed Julie away from him.  Tr. Vol. 1 26:23-26:24.  However, Steven acknowledged that the children "were on [his] arm," and "were [ ] trying to get [him] to drop the knife."  Id. 52:3-52:24.  According to the children's reporting of the incident to Dr. Haynes, JMN and JSN pulled Steven off Julie; Steven dropped the knife and pushed Julie across the kitchen.  Haynes Report at 35, 42; see also Tr. Vol. 2 46:22-47:25.  Julie suffered three broken ribs as a result.  Tr. Vol. 2 52:13-52:24.

The evidence is mixed whether Steven was "intoxicated" during this dispute.  But the Court finds the evidence persuasive that he was.[8]  This is especially so in light of the Court's general conclusion that Steven was not a credible witness.[9]

_____

[7] Julie admitted to employing a frying pan in self-defense, but she testified that she had swung the frying pan at Steven's head during the initial argument over control of the cell phone, and that she did not actually make contact.  Tr. Vol. 2 42:22-43:14, 60:1-60:2, 119:3-119:22.

[8] This evidence includes Julie's testimony, id. 41:20-42:2, 42:10-42:13, 45:21-45:23, which the Court finds credible, and statements of the children, see Haynes Report at 34-35 (JMN opining that her father was intoxicated during the incident); id. at 45 (MKN stating his father was drunk that day).  Steven's claim that he was not "intoxicated," Tr. Vol. 1 43:8-43:9, 51:3-51:6, is belied by his own admission that he had "at least four drinks" before Julie asked him to stop, Haynes Report at 10.

However, regardless of his level of intoxication or which version of the December 26 assaults is adopted, there is no evidence to suggest that any of the children were physically harmed or threatened in the course of this incident. Even assuming the children did physically intervene when Steven pinned Julie, at no point did he turn his physical aggression on the children or otherwise involve them in the physical dispute. Nor is there evidence to suggest that the children were physically abused, or subject to threats of physical harm, at any other time in the Neumann home.[10]

Conversely, there is some evidence of limited and isolated instances of emotional and verbal abuse directed toward the children. For instance, the children uniformly conveyed to Dr. Haynes that their father would often "yell at them," for insignificant reasons (e.g., for playing games or for talking in the car) or no apparent reason at all, often while intoxicated. Haynes Report at 34, 35-36, 37, 41-42, 45. The children also referred to somewhat manipulative

_____

[9] The Court's credibility determination arises from a number of inconsistencies and exaggerations the Court perceived in Steven's story, as derived from his testimony and other evidence submitted to this Court. Compare Tr. Vol. 1 51:3-51:6 (Steven testifying that he "had just woken up that morning," when the physical altercation on December 26 began), with Haynes Report at 10 (stating to Dr. Haynes that on December 26 he had begun drinking at noon and had consumed at least four drinks prior to Julie asking him to stop); compare Tr. Vol. 1 59:6-59:16 (Steven testifying that he saw Dr. Resnikoff twice a week in January, and then twice a month beginning in February), with id. 59:15-59:20, 88:6-88:12 (Steven conceding that he had seen Dr. Resnikoff a total of just five times); compare id. 58:4-58:14 (Steven testifying that the only time he had used Valium was after Julie had left Mexico with the children), with Maple Grove Records, Resp't Ex. II, at 330005 (Steven reporting, as part of medical history, that he had taken two 5 mg Valium a day for past year and a half).

[10] Dr. Haynes's report indicates that JSN stated that Steven would frequently "slap" him in the back of the head, both in the course of "horsing around" and when Steven was angry. Haynes Report at 41. To the extent that these were instances of physical discipline, courts generally do not view physical discipline as abusive so long as the alleged discipline did not result in more-than-minimal physical harm to the child. See Guerrero v. Oliveros, 119 F. Supp. 3d 894, 913 (N.D. Ill. 2015) (alleged physical abuse cannot support grave risk exception when it did not exceed traditional disciplinary measures). There is no evidence that the alleged slapping ever reached such an excessive degree.

behavior, such as Steven attempting to buy the children's forgiveness for actions he had undertaken while drunk (e.g., for yelling and swearing at them).  Id. at 37-38, 41, 45.

Steven believes that his alcoholism played a causal role in the divorce.  Id. at 10.  By his own admission he is an alcoholic, although he contends that the problem is under control.  Tr. Vol. 1 28:25-29:2, 60:22-60:23, 84:2-84:4.  The Court disagrees with the latter part of that statement, as the evidence reveals that, despite Steven's addiction, he is not responsibly pursuing or undergoing appropriate treatment.

Aside from the influence of alcohol on the December 26 incident, the evidence demonstrates that Steven has a "pattern of alcohol abuse . . . characterized by episodic and alternating binges and abstinence."  Haynes Report at 49.  The evidence confirms that Steven's consumption at various times was excessive; the children and Julie indicated that Steven would have difficulty walking and would fall over; his speech would be blurred, and he would otherwise "not [be] himself."  E.g., id. at 42, 45; Tr. Vol. 2 36:14-37:2, 62:24-63:5, 64:24-65:2, 65:14-65:20.  At one point, the level and/or frequency of consumption resulted in elevated liver enzymes.  Tr. Vol. 3 65:12-65:15 (Dkt. 46).  Following Julie and the children's departure from the home, Steven drank quite heavily for approximately four days, sobering up only when his brothers flew down to check on him.  Tr. Vol. 1 27:20-27:22, 56:21-57:19; Haynes Report at 11.

At his brothers' urging, Steven returned briefly to the United States, enrolling in an alcohol abuse rehabilitation center (Maple Grove) for an in-treatment, five-day service.  Tr. Vol. 1 86:15-86:21.  He was diagnosed with an alcohol disorder and a sedative-use disorder, as well as alcohol and drug withdrawal.  Maple Grove Records, Resp't Ex. II, at 330001, 330003 (listing final diagnoses).  But he stayed just three days and two nights before checking out against medical advice.  Id.; Tr. Vol. 1 58:19-58:21, 86:17-86:25.

22

Upon his return to Mexico, Steven began treating with a psychiatrist, Dr. David Resnikoff. Tr. Vol. 1 28:15-28:20; Haynes Report at 15-16. However, as of the date of the evidentiary hearing, Steven had seen Dr. Resnikoff just five times over the course of approximately seven months, and had not met with Dr. Resnikoff at all in the five months leading up to the evidentiary hearing. Haynes Report at 15-16; Tr. Vol. 1 87:14-89:1. Furthermore, by Dr. Resnikoff's own account, his treatment of Steven was not for alcoholism, but focused primarily on medication prescription and monitoring, as well as "some supportive work" with regard to work-related problems. Haynes Report at 15-16.

While Steven testified that he was engaged in Alcoholics Anonymous ("AA") in Mexico, he acknowledged that he had attended just three meetings over a three-month period and that the meetings were in Spanish, which Steven does not speak and of which he has just a limited understanding. Tr. Vol. 1 28:21-28:24, 61:1-62:12, 90:24-91:3; see also Haynes Suppl. Report at 3. Steven also testified that his mother serves as his AA sponsor. Tr. Vol. 1 62:25-63:13. See also Haynes Suppl. Report at 3; Tr. Vol. 1 144:17-145:4, 152:9-152:20 (testimony from Steven's mother that she serves as Steven's sponsor and/or mentor with regard to alcoholism). According to Dr. Haynes, family members do not qualify as AA sponsors. Haynes Suppl. Report at 3. Steven's reliance on his mother to serve as his AA sponsor suggested to Dr. Haynes that Steven is not invested in the AA program and does not understand certain fundamental aspects of it. Id. Thus, Dr. Haynes opined that Steven's alcoholism remains untreated, notwithstanding his alleged abstention from alcohol consumption. Id.; see also Haynes Report at 9, 49 (initial report stating Dr. Haynes's opinion that Steven's alcoholism was untreated despite his abstinence). The Court agrees.

Nonetheless, Steven's alcoholism does not appear to pose a physical danger to the children. There is no evidence that Julie refused to allow the children to remain in Steven's care unsupervised — whether he was drinking or not — or that Steven's alcoholism ever resulted in severe neglect of the children. Moreover, the two boys are of an age (13 and 14) where they are, in many ways, self-sufficient and can manage most of their basic needs without significant supervision.

All that said, a lack of record evidence that the children were previously physically abused or otherwise harmed does not end the inquiry. The Convention, by its own terms, protects children from being subjected to a grave risk of <u>psychological</u> as well as physical harm. Hague Convention, art. 13(b). Many courts have recognized not only the psychological effect of spousal abuse on children, but also the risks spousal abusers pose, physically and psychologically, to children. <u>E.g.</u>, <u>Walsh v. Walsh</u>, 221 F.3d 204, 219-220 (1st Cir. 2000); <u>Van De Sande v. Van De Sande</u>, 431 F.3d 567, 570 (7th Cir. 2005). In that sense, the Hague Convention protects both direct and <u>indirect</u> victims of domestic violence. <u>See</u> <u>Simcox v. Simcox</u>, 511 F.3d 594, 604-605 (6th Cir. 2007). Thus, that the alleged physical abuse was directed toward Julie and not the minor children does not categorically preclude application of the "grave risk" exception.

As a general matter, spousal abuse is relevant only "if it seriously endangers the child." <u>Souratgar v. Lee</u>, 720 F.3d 96, 103-104 (2d Cir. 2013). As such, most courts confronted with a single instance of spousal abuse, or even multiple instances of spousal abuse that could be characterized as less-than-severe, have found that such abuse alone is insufficient to establish a grave risk of psychological or physical harm to the child.[11] However, when a significant history

---

[11] <u>See, e.g.</u>, <u>Whallon v. Lynn</u>, 230 F.3d 450, 460 (1st Cir. 2000) (alleged verbal abuse of spouse and spouse's daughter and one instance of physical shoving insufficient to trigger grave risk

of spousal abuse is accompanied by something more — such as credible threats against the

children or a history of violence against third parties — courts are more likely to find that return

poses a grave risk of physical or psychological harm to the child.[12]   Similarly, when a

---

exception in absence of allegations of physical or psychological abuse toward child); <u>Aly v. Aden</u>, No. 12-1960 (JRT/FLN), 2013 WL 593420, at *17-18 (D. Minn. Feb. 14, 2013) (four short-lived instances of minor domestic violence, only one of which was witnessed by child, insufficient to establish grave risk of harm when violence was not directed at the minor female child, even if petitioner demonstrated controlling and disrespectful behavior toward women); <u>Jensie v. Jensie</u>, No. 2012-203 (WOB), 2012 WL 5178168, at *3, 7 (E.D. Ky. Oct. 18, 2012) (concluding that the domestic incident described — punching father in groin in retaliation for pushing and squeezing mother's breast — was relatively minor and isolated, particularly in absence of threats or violence toward the child); <u>Rial v. Rijo</u>, No. 1:10-CV-01578-RJH, 2010 WL 1643995, at *2 (S.D.N.Y. Apr. 23, 2010) (history of verbal and physical spousal abuse, at times with child present, insufficient to establish grave risk on its own, but concluding child's emotional dependence on mother would subject child to grave risk of psychological harm if separated, therefore ordering child returned to country in mother's custody); <u>Fernandez v. Bailey</u>, No. 1:10CV00084 SNLJ, 2010 WL 3522134, at *2-3 (E.D. Mo. Sept. 1, 2010) (emotional, psychological, and two instances of physical abuse insufficient to establish grave risk when respondent was never seriously harmed and there was no evidence petitioner was violent, abusive, or neglectful to the children), <u>modified by</u>, 2010 WL 5399220 (E.D. Mo. Dec. 23, 2010); <u>Foster v. Foster</u>, 654 F. Supp. 2d 348, 360-362 (W.D. Pa. 2009) (despite history of spousal abuse in form of verbal abuse and at least two instances of physical abuse, respondent did not demonstrate grave risk); <u>Aldinger v. Segler</u>, 263 F. Supp. 2d 284, 289-290 (D.P.R. 2003) (finding that, "[w]hile there has been violent behavior between the parties in this case, there are no allegations of direct physical or psychological abuse against the children," therefore grave risk exception not met, but requiring the then-physical custody arrangement maintained upon return).

[12] <u>E.g.</u>, <u>Acosta v. Acosta</u>, 725 F.3d 868, 872-873, 875-876 (8th Cir. 2013) (history of verbal and physical abuse against respondent, coupled with petitioner's violent reaction when respondent attempted to pick up the family's belongings and petitioner's threats to kill all parties involved, including himself and the children, established grave risk of harm despite little evidence that he had ever harmed children previously); <u>Van De Sande</u>, 431 F.3d at 569-570 (reversing district court's conclusion that because the majority of petitioner's physical and verbal abuse was directed toward respondent and there was no evidence regarding the psychological effect of the abuse on the children grave risk of harm had not been established, on the grounds that the petitioner's propensity for violence and disregard for children's welfare by beating and berating respondent severely and repeatedly in their presence, coupled with his threats to kill respondent and the children rendered the risk grave); <u>Sabogal v. Velarde</u>, 106 F. Supp. 3d 689, 704-707 (D. Md. 2015) (heavy alcohol consumption while on prescription medications coupled with unique and extreme verbal and psychological abuse in front of and to the children — including extreme and repeated physical threats to himself, respondent, and the children — and coercing the children into participating in the verbal and psychological abuse of respondent constituted grave

respondent-parent presents credible and significant evidence of the psychological effect of domestic violence on a child, e.g., post-traumatic stress disorder ("PTSD"), that is likely to be triggered or continued by return to the country of habitual residence, courts have typically found the "grave risk" exception established.[13]

Even adopting Julie's version of the December 26 events, the facts presented here — an isolated, albeit serious, instance of domestic abuse directed solely at a spouse — places the instant case squarely in the first category of spousal-abuse cases.   While the children's description of their father and his day-to-day presence in their lives was less than flattering, the evidence does not reveal a pattern of violence or the "something more" to indicate that Steven's past abuse of Julie could materialize into a "grave risk" to the children.

This distinguishes the present case from those cases on which Julie relies.   See Resp't Proposed Findings of Fact & Conclusions of Law at 17-19.[14]   For instance, in Walsh the court

_____

risk of harm); In re D.T.J., 956 F. Supp. 2d 523, 543-548 (S.D.N.Y. 2013) (significant history of spousal abuse witnessed by child, coupled with petitioner's kidnapping of child from respondent for ten months and consistent verbal harassment of child and threats to respondent and family following child's removal rendered psychological risk grave).

[13] E.g., Blondin v. Dubois, 238 F.3d 153, 163 (2d Cir. 2001) (grave risk of psychological harm encompasses almost certain reoccurrence of traumatic stress disorder that were to occur on child's repatriation to country of habitual residence); Reyes Olguin v. Cruz Santana, No. 03 CV 6299 JG, 2005 WL 67094 (E.D.N.Y. Jan. 13, 2005) (holding grave risk exception established as to both children when the older child suffered from PTSD due to witnessing significant and frequent spousal abuse, which caused the child to imitate his abusive father and threaten harm against his mother, sibling, and himself); Rodriguez v. Rodriguez, 33 F. Supp. 2d 456, 461-462 (D. Md. 1999) (fully crediting uncontradicted testimony that two of the three minor children suffered PTSD after witnessing physical and emotional abuse levied at mother and eldest child, and that returning the children to the site of the abuse, even if the abuse were to stop, would result in psychological trauma).

[14] Julie does refer to a history of assaultive behavior, Resp't Proposed Findings of Fact & Conclusions of Law at 7, however this history encompasses one instance of assaulting a police officer in 1993, over 20 years ago, and the charge may have been expunged.   Maple Grove Records at 330064.   Accordingly, the Court declines to infer a pattern of violence against third parties from this single incident.

was presented with evidence of a lengthy and severe history of domestic violence directed toward the petitioner's (at times pregnant) wife and adult children, in addition to other violent behavior such as locking the children into their rooms and breaking into and ransacking the wife's home.  Walsh, 221 F.3d at 219-220.  Similarly, while Baran v. Beaty, 526 F.3d 1340, 1345-1346 (11th Cir. 2008), shares some characteristics with our case, namely, frequent and excessive alcohol consumption, as well as physically and verbally abusive behavior toward the mother in front of the child, it also is different in that the petitioner's behavior endangered the child on at least two occasions, and he had made repeated threats against the child both before and after the child's birth.

The Sixth Circuit, in confronting the difficult question of how much domestic abuse is necessary to trigger the "grave risk" exception, has described three classes of abusive situations: (i) when the abuse is relatively minor and the court must order return of the child; (ii) when the risk is clearly grave, i.e., there is credible evidence of sexual abuse or similarly grave physical or psychological abuse, such as death threats or other serious neglect; and (iii) those middle-of-the-road cases when the abuse is substantially more than minor but less than obviously intolerable. Simcox, 511 F.3d at 607-608.  The Neumann situation falls within that last class of cases involving "middle-of-the-road" allegations of abuse.

Simcox is instructive, because the Sixth Circuit considered those facts to present a "close question," id. at 609, yet the allegations of abuse, and the resultant psychological impact, were more severe than those at issue here.  Specifically, Simcox involved allegations of both physical abuse — in the form of repeated beatings, hair and ear pulling, and belt whipping — and psychological abuse — in the form of profane outbursts and spousal abuse in the children's presence. Id. at 608.  The Simcox court rested its "grave risk" determination on the serious

27

nature of the abuse, its "extreme frequency," and the reasonable likelihood it would continue, in addition to a diagnosis of PTSD that would be exacerbated upon return. Id. at 608-609. Crucially, the alleged abuse in our case was only psychological in nature, isolated and sporadic, and it is far from certain that it is likely to reoccur in the future.

Steven's drinking, as an added and interrelated component to the domestic violence issue, does not significantly alter this analysis. Many courts have found that allegations of excessive drinking — even paired with the various dysfunctions that often accompany excessive drinking — speak more to parental fitness, a custody issue, than to whether the parent presents a grave risk of harm to the child.[15] While the Court does not suggest that an alcohol addiction can never give rise to a grave risk of harm, in the absence of evidence that Steven's alcoholism has led to concrete neglect or abuse of the children, the Court cannot conclude that it meets the high threshold for a "grave" risk of harm. As such, Steven's alcohol dependency, and any

---

[15] E.g., San Martin v. Moquillaza, No. 4:14-CV-446, 2014 WL 3924646, at *6 (E.D. Tex. Aug. 8, 2014) (mother's intoxication to point where she could not stand up or take care of herself, in front of children, speaks more to parental fitness than grave risk of harm); Vazquez v. Vasquez, No. 3:13-CV-1445-B, 2013 WL 7045041, at *27 (N.D. Tex. Aug. 27, 2013) (drinking habits speak more to parental fitness than grave risk), aff'd, 575 F. App'x 507 (5th Cir. 2014); Bernal v. Gonzalez, 923 F. Supp. 2d 907, 922-923 (W.D. Tex. 2012) (allegations that mother over-consumed alcohol, entertained men for money at night, and did not keep a clean home, in absence of evidence of serious abuse and/or neglect, spoke more to fitness as parent, not grave risk); Oddy v. Morris, No. 11-00715 LEK-KSC, 2012 WL 464227, at *9-10 (D. Haw. Feb. 10, 2012) (credible evidence that petitioner was physically, verbally, and mentally abusive to respondent in front of children, and that his alcohol abuse and anger management issues affected family did not demonstrate harm or risk of harm sufficient to trigger exception); Laguna v. Avila, No. 07-CV-5136 (ENV), 2008 WL 1986253, at *8-9 (E.D.N.Y. May 7, 2008) (father's excessive drinking failed to establish grave risk, despite evidence that, when drunk, father kicked child out of house to be picked up by mother, because (i) no evidence that father presently had a drinking problem, and (ii) no evidence that father ever physically or psychologically abused the child or was likely to do so in future).

consequential effect on the children, will be something for the court that makes the custody determination to consider.[16]

There is no question that witnessing the incident on December 26 has affected the children; however, Julie has not presented sufficient evidence that the psychological impact is so great that a return to Mexico would subject the children to a grave risk of purely psychological harm.  While Mr. Snyder reported that the children were exhibiting symptoms consistent with PTSD, Dr. Haynes opined that, at the time of his evaluation at least, the children were "struggling more with the experience of their family being significantly disrupted, rather than . . . experiencing symptoms of PTSD."  Haynes Report at 51; see also id. at 52.  Moreover, while Dr. Haynes identified a number of risk factors — including Steven's untreated alcoholism, the ongoing and contentious nature of the divorce, and the prior domestic violence — which he characterized as "significant," he concluded only that there is "psychological risk."  Haynes Suppl. Report at 3; Haynes Report at 49-50.  This conclusion lacks the necessary conviction for the Court to infer that the psychological risk is "grave."

Furthermore, certain assumptions Dr. Haynes built into his risk analysis may not even come to pass.  For instance, Dr. Haynes explained that parties in the midst of a contentious divorce who cohabit are subject to some of the greatest risks and stressors.  Haynes Report at 50.  However, the Court is not requiring, nor does it expect, Julie and Steven to cohabit upon return of the children to Mexico.  Therefore, it is much less likely that the children will witness or otherwise become involved in any future domestic disputes between Steven and Julie in a

---

[16] Regarding Julie's contention that Steven suffers from additional psychological disorders such as depression or a personality disorder, Resp't Proposed Findings of Fact & Conclusions of Law at 7, the Court declines to infer a grave risk of harm from those alleged ailments for the same reasons applicable to Steven's alcoholism.  See Currier v. Currier, 845 F. Supp. 916, 923 (D.N.H. 1994).

cohabitation setting.  See Mendez v. May, 85 F. Supp. 3d 539, 559 (D. Mass. 2015) (verbal abuse and two instances of physical abuse, some of which occurred in front of child, insufficient to establish grave risk because opportunities for future interaction of parties in front of child are limited, therefore child unlikely to witness further abuse), rev'd on other grounds, 778 F.3d 337 (1st Cir. 2015); Belay v. Getachew, 272 F. Supp. 2d 553, 560 (D. Md. 2003) (some evidence of spousal abuse insufficient to establish grave risk when parties are divorced and unlikely to live together, particularly considering complete absence of allegations of abuse to child).

Dr. Haynes also referred to the risk of the children being unsupervised with Steven in Mexico.  Haynes Suppl. Report at 3.  But, as a legal matter, ordering the children's return to Mexico does not also require that the children be returned, specifically, to Steven's custody. See, e.g., Blondin v. Dubois, 189 F.3d 240, 249 (2d Cir. 1999) ("[G]ranting Blondin's petition would not-as a legal matter-invariably entail turning the children over to his custody.  In fact, other arrangements might be available that would allow the children to return to France in some other person's care, pending a long-term custody adjudication-thus reducing or eliminating the risk of harm that might otherwise be associated with granting Blondin's petition."); Blanc v. Morgan, 721 F. Supp. 2d 749, 766 (W.D. Tenn. 2010) ("[T]he Court emphasizes that ordering M.'s return to France is not the equivalent of ordering that M. be placed in Father's custody.").

Finally, Dr. Haynes also opined that, "[f]rom a psychological standpoint, it would be inappropriate, anxiety-producing, and unwise for the children to be physically split up regarding the issue of Mexico."  Haynes Suppl. Report at 2.  Given JMN's age, the Court can order return of the two younger boys, JSN and MKN, only; it cannot order JMN to return to Mexico.  Courts have differed on whether the trauma resulting from the separation of siblings can constitute a grave risk of psychological harm.  Accounting for psychological harm attributable to the

separation may provide a removing parent with an incentive or an advantage, potentially undermining the purpose of the Convention.  See Whallon v. Lynn, 230 F.3d 450, 460 (1st Cir. 2000) (psychological suffering from separation of siblings insufficient because it would undermine purpose of Convention).  But some courts have found that the separation of siblings, particularly in conjunction with additional and independent risks, can be sufficient to establish a grave risk of harm.  E.g., Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 409 (E.D.N.Y. 2005) (grave risk exception also applied to youngest child given likelihood of future abuse and the psychological harm that would result from her separation from her mother and her siblings, despite not being subject to past physical abuse and not presenting with any psychological problems).

The Court adopts the former view.  While there is no doubt that some psychological pain will arise upon any separation of the two boys from their older sister, the Court sees no reason to distinguish between that resultant pain and any analogous harm that would occur upon a child's separation from the removing parent.  And the Sixth Circuit has made clear that "[a] removing parent must not be allowed to abduct a child and then—when brought to court—complain that the child has grown used to the surroundings to which they were abducted."  Friedrich v. Friedrich ("Friedrich II"), 78 F.3d 1060, 1068 (6th Cir. 1996).  That is, the typical adjustment problems attendant to a child's relocation cannot satisfy the "grave risk" exception.  Id. at 1067-1068.  Furthermore, the psychological pain of a divided family can be remedied if Julie and JMN also return to Mexico.  And the court making the custody determination may also decide that the best interests of the children counsel requiring all the children to remain together, whether in Mexico or the United States.

The Court understands the strong emotions possessed by an understandably protective mother and children who love her and sympathize with her plight. But the Court must steel itself from rendering a decision based on who might be the better parent or where the children might feel happier. The Convention and the authorities interpreting it require a dispassionate review of the evidence. And that review leads to the conclusion that Julie has not presented clear and convincing evidence that requiring JSN and MKN to return to Mexico would expose them to a grave risk of physical and/or psychological harm.

### III. CONCLUSION

For the aforementioned reasons, the Court grants Petitioner Steven Neumann's petition for return of two of the three minor children, JSN and MKN. Respondent Julie Neumann is ordered to return those two children to Mexico no later than June 30.[17]

---

[17] In his proposed findings of fact and conclusions of law, Steven asks this Court to make a ruling under the Michigan Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), Mich. Comp. Laws § 722.1101, et seq., that the children be returned to Mexico for an appropriate custody determination made by Mexican courts pursuant to Mexico's laws. See Pet'r Proposed Findings of Fact & Conclusions of Law at 25 (Dkt. 49) ("A final judgment in Petitioner's favor be entered by this Court under the Hague Convention, ICARA, and UCCJEA directing that the children be returned to their habitual residence in Mexico, where an appropriate custody determination can [be] made by a Mexican court under Mexican law[.]"). Steven asserts that the "UCCJEA is intended to resolve jurisdictional disputes relating to 'child custody determinations' or 'child-custody proceedings,'" and "[b]ecause this action involves a jurisdictional determination regarding a child custody proceeding and [Petitioner] resides outside of Michigan, interpretation and application of the UCCJEA is required." Id. at 20-21. However, Steven's verified complaint initiating this action under the Hague Convention contains no claim pursuant to the UCCJEA, or request for relief under the UCCJEA. Indeed, it makes no mention of the UCCJEA. In the absence of a request in the complaint, Plaintiff's post-pleading request to rule on the UCCJEA is not properly before the Court. See Malibu Media, LLC v. Ricupero, No. 2:14-cv-821, 2015 WL 4273463, at *3 (S.D. Ohio July 14, 2015) ("A request for declaratory relief is properly before the court when it is pleaded in a complaint for declaratory judgment. Requests for declaratory judgment are not properly before the court if raised only in passing, or by motion." (quoting Arizona v. City of Tucson, 761 F.3d 1005, 1010 (9th Cir. 2014)).

In any case, Steven cites to no case stating that this Court has jurisdiction to make a ruling under the UCCJEA. In the absence of such authority, the Court makes no decision regarding that

In addition, on or before May 31, 2016, the parties shall file a joint memorandum addressing whether any issues remain to be resolved, including  attorney fees and costs, and if so, what further proceedings are required.

SO ORDERED.


Dated:  May 17, 2016                          s/Mark A. Goldsmith
Detroit, Michigan                             MARK A. GOLDSMITH
                                              United States District Judge


### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 17, 2016.

                                              s/Karri Sandusky
                                              Case Manager

---

statute.  Nor does it rule on whether a Mexican court or a Michigan court should determine custody.  Neither party has properly raised that issue in his or her pleadings.