UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN MICHAEL NEUMANN,

        Petitioner,                               Civil Action No. 15-CV-11995

vs.                                                    HON. MARK A. GOLDSMITH

JULIE ANNE NEUMANN,

        Respondent.
_____/

## OPINION AND ORDER DENYING RESPONDENT'S MOTION TO STAY (Dkt. 67)

On May 17, 2016, this Court issued a decision granting in part Petitioner Steven Neumann's petition for return of children pursuant to the Hague Convention and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, et seq. That decision ordered Respondent Julie Neumann to return two of the three minor children, JSN and MKN, to Mexico by June 30, 2016. See 5/17/2016 Op. & Order (Dkt. 58). On June 23, 2016, just a week before the return date, Julie filed the instant motion to stay the Court's return order pending appeal (Dkt. 67). The Court expedited the hearing on the motion and ordered a response from Steven. After reviewing the submissions and hearing from both parties, the Court issued an interim order adjourning the original return date to July 27, 2016, in part so that the Court could fully consider the motion and set forth a decision in writing. See 6/29/2016 Order (Dkt. 72). The Court now denies Julie's motion, concluding that none of the four factors relevant to the appropriateness of a stay weighs in favor of issuing one here.

### I. ANALYSIS

The four traditional stay factors guide the Court's analysis: "(1) whether the stay applicant has made a strong showing that [s]he is likely to succeed on the merits; (2) whether the

applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Chafin v. Chafin, 133 S. Ct. 1017, 1027 (2013). The Court addresses each in turn.

### A. Likelihood of Success on the Merits

Julie posits that she is likely to succeed on two issues: (i) whether Mexico was the children's country of habitual residence; and (ii) whether there is a grave risk that returning the children to Mexico would expose them to physical or psychological harm. Resp't Mot. at 9. To meet the "strong showing" standard, "[i]t is not enough that the chance of success on the merits be 'better than negligible.'" Nken v. Holder, 556 U.S. 418, 434 (2009) (quoting Sofinet v. INS, 188 F.3d 703, 707 (7th Cir. 1999)). More than the "possibility" of relief on appeal is required. Id. In light of the existing record, the applicable burdens of proof, and the current state of the law, Julie cannot meet the necessary threshold on either issue.

#### 1. Habitual Residence

As part of the prima facie case for wrongful removal, Steven needed to prove by a preponderance of the evidence that Mexico was the children's country of habitual residence. Robert v. Tesson, 507 F.3d 981, 994-995 (6th Cir. 2007). That term is defined as "the nation where, at the time of their removal, the child has been present long enough to allow acclimatization, and where this presence has a degree of settled purpose from the child's perspective." Id. at 993. The parties agree on the basic facts relevant to this first issue; the disagreement is over the legal implications of those facts.

Julie asserts that the children perceived their time in Mexico as a transient, time-bound dead end. Julie argues that despite the children's physical location in Mexico, they never truly acclimated to the Mexican culture, pointing to their attendance at an English-speaking school

2

with an English-style curriculum, and the non-Mexican citizenship of their friends. Resp't Mot. at 12. She contrasts this alleged lack of acclimatization to the children's strong, enduring personal bonds to Michigan, maintaining that the stay in Mexico was merely a temporary sojourn away from their permanent home in Michigan. Id. at 13.

To be sure, the children's residence in Atizapán de Zaragoza, Mexico, a suburb of Mexico City, was prompted by Steven's work assignment with Ford Motor Company, but Julie conflates the notion of non-permanence with that of transience. A "degree of settled purpose" does not require that the residence be "permanent." See Silverman v. Silverman, 338 F.3d 886, 898 (8th Cir. 2003) ("This settled purpose need not be to stay in a new location forever, but the family must have a 'sufficient degree of continuity to be properly described as settled.'"); Koch v. Koch, 416 F. Supp. 2d 645, 651-652 (E.D. Wis. 2006) ("Courts that focus on the duration of a family's stay in a country and the objective facts surrounding it will generally be able to distinguish between temporary visits such as sabbaticals and/or limited stays involving only one parent and situations where parties establish habitual but not necessarily permanent residences."), aff'd on other grounds, 450 F.3d 703 (7th Cir. 2006).[1] Rather, it looks to "'whether [the child] developed a certain routine and acquired a sense of environmental normalcy by forming meaningful connections with the people and places [he] encountered in a country prior to the [removal] date'"; it "is experience-driven," "focus[ing] on the child's

---

[1] Even courts employing the "parental intent" test, rejected by the Sixth Circuit, have agreed that the fact that a stay in a new country was of a limited or agreed-upon duration does not preclude that new country from becoming the place of habitual residence for the child. See, e.g., Ermini v. Vittori, 758 F.3d 153, 162 (2d Cir. 2014) ("[A] habitual residence may be established even when a move is for a 'limited period' and indeed 'indefinit[e].'" (quoting Shah v. Barnet London Borough Council and other appeals, [1983] 1 All E.R. 226, 235 (Eng. H.L)) (emphasis in original)); Whiting v. Krassner, 391 F.3d 540, 550 (3d Cir. 2004) ("[T]he fact that the agreed-upon stay was of a limited duration in no way hinders the finding of a change in habitual residence. Rather . . . the parties' settled purpose in moving may be for a limited period of time.").

3

physical presence and the objective connections he has with a country." McKie v. Jude, No. 10-103-DLB, 2011 WL 53058, at *8-9 (E.D. Ky. Jan. 7, 2011) (quoting Karkkainen v. Kovalchuk, 445 F.3d 280, 292 (3d Cir. 2006)).

That some of the children's connections were not specifically with native-born Mexicans does not persuade the Court otherwise. For instance, the fact that the children's friends were of a variety of nationalities or that they received their instruction in English fails to demonstrate that the children were not comfortably settled in their home in Mexico, such that their situation had failed to stabilize or normalize.[2] "The Hague Convention is intended to prevent a case where 'the child is taken out of the family and social environment in which its life has developed.'" Robert, 507 F.3d at 991 (quoting Elisa Perez–Vera, Explanatory Report ¶ 12, in 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 1069 (1982)). What that environment looks like will vary from family to family. For the Neumanns (and many other expatriate families) it may have consisted of an international, English-speaking school and a community of internationally diverse friends. That does not make it any less settled from the children's perspective.[3] And while the Court does not doubt that the

---

[2] Julie appears to rely on Robert for the proposition that speaking the native language and attending a native school points in the direction of acquiring that country as a habitual residence. See Resp't Mot. at 12. While Robert did note that the children in that case were fluent in French and attended a French school, the court did not suggest that attendance at an international school or a school with a different instructional language would have undercut a finding of habitual residence. Rather, like this Court, it focused on aspects of daily living to determine habitual residence, such as the limited clothing the children had brought to France, the borderline unlivable state of the father's residence, and the actual amount of time (three weeks) spent in France by the children. Robert, 507 F.3d at 997-998.

[3] Additionally, Julie's argument that "[w]itnessing their Greengates schoolmates routinely returning to their respective countries of origin can only have solidified the perception that their own stay in Mexico was temporary," Resp't Mot. at 13 (internal citation omitted), relies on Julie's testimony that after the children moved to Michigan many of their friends departed Mexico for elsewhere, Redacted Tr. Vol. 2 22:15-22:23 (Dkt. 52). This testimony hardly

children maintained strong connections back in Michigan, the record reveals only that while in Mexico the children maintained relationships and kept in contact with their Michigan friends and family; it does not demonstrate that their primary or most significant social interactions and connections were tied to Michigan.[4]

That the children were aware that their time in Mexico might come to an end when the current term of Steven's contract is set to expire in 2017 — a contract that had been previously renewed in 2014 and might be again — does not somehow diminish that the Neumann family, including the children, built and experienced their day-to-day lives there. For almost four years, Mexico was the place where the children went to school, played with friends, and spent time together as a family. The Court would be hard-pressed to conclude that this amount of time was insufficient for the children to become settled in their physical environment. Indeed, as MKN expressed in his interview with the Court, Steven's actions prompting the children's relocation

---

establishes anything about what the children "routinely" experienced, and any claimed impact on them is entirely speculative.

[4] Julie's citations to the record hardly establish the primacy of the Michigan connections. Resp't Mot. at 13. For instance, she points to the unremarkable proposition that the children remained close with their grandmother. Redacted Tr. Vol. 2 25:25-26:18 (describing the children as having a good relationship with their maternal grandmother, who lives in Michigan). Other evidence she points to states in conclusory fashion that the children maintained some unspecified form of contact with friends and relatives in Michigan. See id. 19:24-20:5 (Julie testifying that the children "continue[d] to have contact" with Michigan, by being "in touch" with friends and family through Facebook); id. 20:18-20:25 (Julie testifying that the children "[kept] in contact" with friends from Michigan while in Mexico); id. 25:12-25:17 (Julie testifying that the children "maintained their relationships" with friends and family from Michigan while in Mexico). Other evidence merely shows that the children socialized with their friends and relatives when visiting Michigan during the summer. Id. 20:6-20:7 (Julie testifying that when the children visited Michigan "they went right back with their friends and their family"). Other evidence speaks to the children's experiences after relocating from Mexico to Michigan. See Redacted Tr. Vol. 1 79:12-79:23 (Dkt. 51) (counsel for Julie questioning Steven regarding the extent of JMN's communications with her cousins after the children's return to Michigan); Redacted Tr. Vol. 2 20:25-21:1 (Julie testifying that upon return to Michigan the children rejoined their old groups of friends and made new friends); id. 99:15-99:22 (Julie testifying that the children associated with their paternal relatives while visiting the family cottages, and that the children were invited to a party by Steven's sister-in-law after returning to Michigan).

5

"had changed his life forever," causing "the children to move and change schools when the family was supposed to stay in Mexico for four more years." 5/17/2016 Op. & Order at 7 n.5.

The cases on which Julie relies for support for her argument either apply the "parental intent" standard — rejected by the Sixth Circuit, see id. at 6-7 (citing Robert, 507 F.3d at 990-991) — or are distinguishable on their facts. See Papakosmas v. Papakosmas, 483 F.3d 617 (9th Cir. 2007) (finding no settled parental intent to move the children's habitual residences to Greece, and concluding objective facts did not demonstrate Greece had become the new country of habitual residence when children lived there for barely a four-month period); Armiliato v. Zaric-Armiliato, 169 F. Supp. 2d 230 (S.D.N.Y. 2001) (child's habitual residence was Italy, the place to which she continually returned between trips abroad and where she most frequently attended school; travel to other countries up to two months at a time with her father, who performed operatic engagements, did not undermine that conclusion).

Accordingly, the Court concludes that Julie has not established a likelihood of prevailing on appeal as to whether Steven proved Mexico was more likely than not the children's country of habitual residence.

### 2. Grave Risk of Harm

In contrast to the "preponderance of evidence" burden imposed on Steven to demonstrate a wrongful removal, the standard for Julie to establish a "grave risk" defense under the Convention is a heightened one, requiring clear and convincing evidence. See Simcox v. Simcox, 511 F.3d 594, 604 (6th Cir. 2007) ("The 'grave risk' exception is to be interpreted narrowly, lest it swallow the rule."). In her attempt to illustrate that "[t]he Court's determinations [in the May 17 decision] are inconsistent with the overwhelming facts in this case," Resp't Mot. at 15, Julie not only raises new arguments that were not presented to this

6

Court in her post-hearing briefing, she also overstates and distorts the facts of record. Putting those facts in proper perspective, the Court concludes that Julie has not demonstrated that she is likely to prevail on the issue of whether she provided clear and convincing evidence that a return to Mexico creates a grave risk that the children will be exposed to psychological or physical harm.

Julie contends for the first time that Steven's alcoholism has "led to a repeated pattern of domestic abuse — both physically and psychologically." Id.; see also id. at 5.[5] In support of her sweeping assertion, Julie points to her testimony that "there were other instances" of domestic violence by Steven against her prior to December 26, 2014. Redacted Tr. Vol. 2 28:10-28:13 (Dkt. 52). But she also acknowledged in her testimony that "[m]ost of them [were] just minor," id. 30:21-30:24; that they were "[n]ot near the level" reached during the December 26, 2014 incident, id. 28:10-28:13; and that she did not "have a count" as to how many instances of domestic violence there had been, id. 30:21-30:24.

Julie also asserts that Steven "habitually push[ed] and shov[ed her] as a form of intimidation and instigation." Resp't Mot. at 15. Julie had testified that Steven "always bumped [her] with his belly and it would knock [her] and sometimes [she] would go flying." Redacted Tr. Vol. 2 28:24-29:3. But she only described a single concrete incident in which this occurred. Id. 28:20-29:6. Notably, the children did not appear to be present; and Julie herself stated alcohol was not involved. Haynes Report at 26. Beyond this, Julie indicated only that the "belly

---

[5] In her post-hearing briefing, Julie never asserted that the evidence demonstrated a "repeated pattern" of abuse to either her or the children — physical or psychological. Her proposed findings of fact referenced only the December 26, 2014 domestic incident and briefly acknowledged, without indicating any type of frequency or alleging any kind of pattern, that Steven "[i]n the past" had been mentally abusive to the children. Resp't Proposed Findings of Fact & Conclusions of Law at 4-5, 6, 7, 9 (Dkt. 50). The remaining arguments focused on Steven's alcohol and substance-use disorders, and his failure to appropriately treat them. See generally id.

bumping" occurred "more than ten times," noting that sometimes Steven "did it when joking and sometimes he did it in anger." Id. at 25-26. Approximately ten instances, an unknown subset of which was not abusive in nature, over 17 years do not qualify as a "habitual" form of "intimidation and instigation."

Thus, the concrete instances of domestic violence against Julie during the course of a marriage that lasted almost two decades consist of two discrete events — the December 26, 2014 incident and the 2003 Thanksgiving incident when Steven struck Julie while she was driving — and the belly-bumping conduct of uncertain frequency and severity. While any incident of domestic violence is unacceptable, the record does not bear out Julie's characterization of a "repeated pattern" of domestic violence.[6]

Moreover, the abuse of Julie, while certainly distressing, is relevant under the Hague Convention only insofar as it affects the children. See 5/17/2016 Op. & Order at 24 (citing Souratgar v. Lee, 720 F.3d 96, 103-104 (2d Cir. 2013)). The only domestic incident that placed the children at physical risk was the 2003 Thanksgiving incident, in which the children were endangered indirectly by Steven's interference with Julie's ability to control the vehicle. However, there is no evidence that the children were harmed by that instance.

Julie also characterizes the children as being "in the immediate zone of danger created by Mr. Neumann's rage" on December 26, 2014, Resp't Mot. at 16, but, as the Court previously

---

[6] Although not described as such in her motion, during oral argument Julie's counsel characterized the December 26, 2014 event as an attempt by Steven to kill Julie, thwarted only by the intervention of the children. While the December 26 event, as described by Julie, was unquestionably a serious assault, the Court does not conclude that Steven harbored an actual intent to kill Julie or that he attempted to do so. The record is clear that Steven brandished the knife toward Julie in a menacing manner, but there is no evidence that he wounded her or thrust it at her in a way designed to wound her. Further, there is no suggestion in the Haynes Report that the children perceived Steven's actions as an attempt to "kill" their mother; nor was there any such suggestion made to the Court when it interviewed the children.

noted, the record reveals that, despite the children's intervention, Steven did not turn his aggression upon them, 5/17/2016 Op. & Order at 21. And as the Court explained in its May 17 decision, because Julie and Steven are estranged — and now divorced by a Mexican court — even upon JSN and MKN's return to Mexico, the risk that the children would be exposed to any future abuse is remote.

Similarly, the evidence fails to substantiate Julie's assertions regarding the alleged repeated pattern of direct abuse against the children. For the first time in her motion, Julie asserts that Steven "habitually" slapped JSN in the head for no reason. Resp't Mot. at 15. Although Julie had not raised the issue before, the Court did address the issue of slapping in its decision, noting that JSN mentioned the head-slapping to Dr. Haynes, who then reported that JSN had stated that the slapping was sometimes done when Steven was "horsing around" and sometimes when he was angry. See 5/17/2016 Op. & Order at 21 n.10; see also Haynes Report at 41. In addition, there was no evidence that the alleged slapping physically harmed JSN or exceeded traditional measures of discipline.[7]

As for the psychological and mental abuse of the children, Julie relies on statements from the children to Dr. Haynes that, as the Court previously concluded, are indicative of some limited emotional and/or verbal abuse of uncertain intensity, frequency, and purpose. 5/17/2016 Op. & Order at 21-22. The evidence cited by Julie indicates that Steven did yell at or swear at the children, at times while intoxicated, and that in the children's view such yelling was unwarranted. See Haynes Report at 35, 37, 41, 45. JMN and JSN also described Steven as short-tempered, angry, or impatient. Id. at 36, 41, 42. While this conduct may be less than exemplary, there is insufficient detail as to the frequency and circumstances of the "yelling" and

---

[7] In fact, Dr. Haynes noted that "Julie stated that Steve never hit the children," Haynes Report at 26; that "[MKN] stated that his father never has hit the children," id. at 45; and that JMN had stated that "her father never has been physically violent," id. at 35.

9

"swearing" to justify a conclusion that it was never for any proper parental purpose. Notably, Julie never testified that Steven's yelling at the children was excessive or unjustifiable, or that she ever urged Steven to refrain from this behavior. Her failure to criticize Steven for yelling at the children suggests that the behavior was not nearly as egregious as she now claims, especially considering that Julie did not shy away from confronting Steven over conduct she found objectionable, such as his excessive drinking. See Redacted Tr. Vol. 2 30:25-32:7, 32:22-33:5. Accordingly, the Court cannot conclude that Steven's behavior amounted to a repeated pattern of psychological and mental abuse of the children.

Importantly, and as explained in detail in the May 17 decision, neither JSN nor MKN, in their separate interviews with the Court, expressed or communicated a concern about a return to Mexico that raised the specter of physical or psychological harm, let alone of a significant nature. 5/17/2016 Op. & Order at 14. In fact, while both expressed a fierce desire to stay in Michigan and unhappiness with their father, neither boy expressed a specific fear of their father or identified specific concerns about being with him.

Nor did Dr. Haynes assert that a return to Mexico posed a "grave risk" of physical or psychological harm. Rather, he opined that "there are multiple significant risks of different kinds. . . . affect[ing] each of the parties and the children in different ways." Haynes Report at 50. He noted risks of bad behavior associated with Steven's alcoholism, but those risks exist regardless of the location of the children. The mere fact that the children will be in the same country as their father does not mean that they are more likely to be harmed — especially because Steven's interactions with them will be monitored and managed by the court making custody and visitation decisions. Dr. Haynes also cited stress associated with divorce generally, and especially if there is parental cohabitation. Id. at 50. But the former does not present any

special kind of risk to the children, and there is no reasonable likelihood of cohabitation given the estrangement — and now Mexican divorce — of Steven and Julie.

The one specific risk raised was "feelings of apprehension regarding reunification with their father." Id. However, this view was expressed in the context of unsupervised time with Steven and being placed into his custody. Haynes Suppl. Report at 3; see 5/17/2016 Op. & Order at 15-16. Importantly, nothing in this Court's decision requires reunification. The Court did not, and does not, order the children returned directly to Steven's custody. 5/17/2016 Op. & Order at 30. It orders only a return to Mexico, following which another court can sort out the question of custody and visitation.

Dr. Haynes recognized the children's turbulent and contradictory emotions: they expressed concerns about reunification with their father, and yet they "want to improve and expand their relationship" with him. Haynes Suppl. Report at 3. This mix of emotions does not, without more, translate into a grave risk of exposure to psychological harm.

Julie marshals other facts to support her theory that Steven generally is a destructive and dangerous individual. For instance, she recalls two drunk-driving charges, an arrest for assault of a police officer, and a single road-rage incident that took place in Mexico. Resp't Mot. at 5, 6, 15. However, the legal charges stem from incidents that took place between 1991 and 1994, well before the Neumanns were even married. Haynes Report at 17. And those incidents are unconnected to the allegations of abuse at issue here. Notably, Julie and Steven were in agreement that Steven did not generally drink and drive, id. at 17, 26, and there has been no evidence presented to the Court that Steven ever transported the children while intoxicated.

With regard to the 1993 assault, there is absolutely no information as to the circumstances surrounding that incident (including whether alcohol was involved); therefore, the

11

Court declines to draw any type of conclusion from it, particularly considering it occurred over 20 years ago and was ultimately expunged. See id. at 17; Maple Grove Records, Resp't Ex. II, at 330064.[8]

The road-rage incident — where another driver and Steven alternately passed each other while on a highway — reflects irresponsible behavior, but, even by Julie's account, Steven exited the situation when it posed a significant level of risk to the family. See Redacted Tr. Vol. 2 66:4-67:13. While Julie claims that this is another example of how Steven has endangered the children, Resp't Mot. at 16 n.3, the Court cannot reach the same conclusion. Reckless driving is certainly not what one would expect of a responsible father transporting children, but it does not appear to the Court to be indicative of the type of "grave risk" contemplated by the Convention, particularly given the singularity of the event.

Julie also refers to Dr. Haynes's observation that Steven "endorsed a number of extreme and bizarre thoughts which raises the question of the possibility of delusions or hallucinations." Haynes Report at 20; Resp't Mot. at 15. But she has not pointed to specific instances where this has occurred or how it has affected the children in the past. See 5/17/2016 Op. & Order at 29 n.16.

Finally, Julie's motion contends that "the Children have been diagnosed by two independent psychiatrists as suffering from post-traumatic stress disorder ["PTSD"]," arising out of the December 26, 2014 events. Resp't Mot. at 7, 9, 17. At the stay hearing, Julie's counsel opined that returning JSN and MKN to Mexico would trigger such PTSD, causing them grave psychological harm. Not only is this a new argument, but on the current record these statements are both false and misleading.

---

[8] Exhibits of Petitioner and Respondent referred to in this opinion are exhibits admitted into evidence at the evidentiary hearing.

First, while several mental health professionals have been involved in this dispute, none of them is a psychiatrist. Julie's contention about that is simply wrong.

Second, in support of her contention that the children have been diagnosed with PTSD, Julie offers Steven's testimony of what he believes were the conclusions of other mental health professionals — Steven Ceresnie (a Ph.D. psychologist and the children's former therapist) and social worker Chuck Snyder (Julie's therapist who also treated the children). See id. at 7, 17 (citing to Redacted Tr. Vol. 1 73:4-73:18 (Dkt. 51)). The parties submitted no documentation from Dr. Ceresnie, so any view he had on PTSD was relayed second-hand to the Court via Steven's testimony. Steven testified that Dr. Ceresnie (and Chuck Snyder) had informed him that the children were either suffering from PTSD or showing signs of it. Redacted Tr. Vol. 1 73:4-73:15. Because of the hearsay and foundation problems with this testimony, it is not trustworthy.

By contrast, Chuck Snyder's views are documented. He wrote a letter to Julie's lawyer stating that the children were "report[ing] symptoms consistent with [PTSD]," Snyder Report, Resp't Ex. J, at 200002, and he set out a similar opinion at his deposition, Snyder Dep., Resp't Ex. O.[9] But his conclusion is suspect, because he was hardly independent. His role was as Julie's therapist. In fact, he told Dr. Haynes that "Julie[ ] was his client, not the children." Haynes Report at 50. And he also claimed to treat the children by treating Julie. Snyder Dep. at 16 ("[M]y primary role in the children's therapy is treating the mother."). Moreover, according

---

[9] It is unclear whether this was a firm diagnosis for each individual child. For instance, while Chuck Snyder stated in his deposition that he made a diagnosis of PTSD for all three children, Snyder Dep. at 14, other portions of the deposition and his notes suggest that the diagnoses were less definitive and served only as a comparison to Julie's own diagnosis of PTSD. See id. at 19 (indicating that the children's symptoms were to a lesser degree than Julie); Snyder Notes, Ex. A to Snyder Dep., at 300003 ("Kids likely have same diagnosis [of PTSD] with less intensity." (emphasis added)). As the Court mentioned supra, there has been no developed argumentation or analysis on this point.

to Dr. Haynes, Chuck Snyder's "orientation" was that of "trying to protect the children," and he made "diagnostic statements" in connection with the case that were "speculative and ill-advised." Haynes Report at 52. Dr. Haynes's assessment of Chuck Snyder's overall recommendations concerning the Neumann family cast further doubt on both the accuracy and reliability of Chuck Snyder's conclusions regarding the children.

The only credible opinion about PTSD was that of Ph.D. psychologist Dr. Haynes, the independent expert appointed by the Court in this case. He evaluated the children in July 2015 — several months after Chuck Snyder had. While Dr. Haynes stated that Chuck Snyder's PTSD diagnosis "at the time may have been accurate," id. at 51, he opined that "[t]he children are not diagnosed by this examiner at the present with [PTSD]," id. at 52. He explained that "the children were struggling more with the experience of their family being significantly disrupted, rather than . . . experiencing symptoms of PTSD." Id. at 51.[10]

Third, no mental health professional has opined to this Court that returning the children to Mexico would trigger a recurrence of PTSD.

Taken together, the evidence offered by Julie paints a portrait of Steven as an individual with significant mental health issues. But most of the complaints Julie makes against Steven speak to his general character and his fitness as a parent — all relevant considerations for the question of custody, which looks to the children's best interests and other factors relevant to determining appropriate arrangements for rebuilding relationships fractured by divorce. That task, however, is not the province of this Court. Rather, this Court's task is limited to

---

[10] Dr. Haynes's opinion regarding the source, and extent, of JSN and MKN's distress is in line with the Court's own, admittedly non-clinical impressions after speaking with the two boys. And despite Julie's counsel's claim of psychological harm arising from the children's witnessing their father trying to "kill" their mother, as the Court previously mentioned, none of the children actually reported the incident as such, either to Dr. Haynes or to the Court. Indeed, MKN was not even present for the dispute; he heard about it after the fact.

determining whether Julie has presented clear and convincing evidence that a return to Mexico would expose JSN and MKN to a grave risk of physical or psychological harm. She has not done so.[11]

This Court's conclusion that she failed to do so does not somehow render that burden insurmountable, as she claims. Julie may take issue with the law as established under the Hague Convention, but it is not the district court's prerogative to bend that law to accommodate the sympathetic facts of her case. Because the Court concludes that the relief Julie seeks cannot be justified on the record she has developed and the law as it has developed, she is not likely to succeed on appeal.

For those reasons, this first factor does not counsel in favor of a stay.

**B. Irreparable Injury to Julie**

Julie argues that returning the children to Mexico will necessarily require her to return as well, causing her irreparable harm in three ways: (i) Julie's presence in Mexico will place her at "inordinate risk" of abuse from Steven; (ii) Julie faces the threat of criminal prosecution upon her return to Mexico; and (iii) Julie will suffer a derivative irreparable injury resulting from the children being removed from the place they have been living for approximately a year and a half.

---

[11] Julie's motion, and counsel at oral argument, also takes issue with the fact that the Court has not enacted measures that will ensure the children do not suffer further upon the return to Mexico — namely, the failure to impose undertakings. See Resp't Mot. at 18 ("[T]he Court further refused to put in place ameliorative undertakings to protect the Children upon return to Mexico."). Significantly, aside from a post-judgment request to appoint a guardian ad-litem and a therapist for the children, Julie has not requested the Court to impose any type of undertaking on the children's return. Perhaps more importantly, the Court is not authorized to impose undertakings, absent a finding of "grave risk." Simcox, 511 F.3d at 608 ("Absent a grave risk finding, the Convention leaves no room for a court to establish, as the district court did in this case, ameliorative undertakings designed to protect children against the risk of harm upon their return. . . . Once the district court determines that the grave risk threshold is met, only then is the court vested by the Convention with the discretion to refuse to order return. It is with this discretion that the court may then craft appropriate undertakings." (emphasis in original)).

Resp't Mot. at 18-19. While not unsympathetic to the hardships a return to Mexico will cause Julie, the Court disagrees that these claimed injuries are irreparable.

First, the Court has not been presented with any evidence that the threat posed to Julie by Steven is any greater in Mexico than in Michigan. The Court has received testimony that Mexican authorities take seriously domestic violence. Redacted Tr. Vol. 1 116:17-120:7. In fact, Julie testified that when seeking treatment for her injuries in Mexico, she did not tell the Mexican doctors the actual source of the injuries because she "knew" that "they would go and arrest [her] husband and he would be thrown into a Mexican prison and [she] didn't think that was a good idea." Redacted Tr. Vol. 2 55:18-55:21. Thus, Julie herself has acknowledged the efficacy of Mexican law enforcement, which would be at her disposal should she fear for her safety upon her return to Mexico.[12]

Second, the record is far from clear that Steven has threatened to press criminal charges against Julie. Steven's comment that he should have filed charges against Julie for the December 26 incident was a stray remark to Dr. Haynes during Steven's evaluation, triggered by the discussion of the personal protection order that Julie had obtained against him; there did not appear to be any concrete plan by Steven to file a criminal complaint for assault. See Haynes Report at 18. There is also no evidence that Steven intends to bring charges of parental alienation against Julie. Steven and his counsel have repeatedly pressed a theory of parental alienation in this litigation, and Steven's Mexican lawyer testified that parental alienation is criminally prosecutable in Mexico. But the claim that Steven will bring charges against Julie on that theory is just speculative.

---

[12] Julie's acknowledgement of the efficacy of Mexican law enforcement also rebuts any suggestion that she had no alternative to fleeing Mexico with the children. The arrest of Steven would have allowed her and the children to remain in the family home, or she could have made arrangements to stay with friends in Mexico, which she did in fact do for two days before fleeing to Michigan. See Redacted Tr. Vol. 2 50:16-50:21, 55:24-56:3, 56:7-56:13, 58:1-58:3.

16

In any event, being called to answer criminal charges in another country is not an irreparable injury in and of itself. There has been no indication that the courts of Mexico are incapable of fairly adjudicating any charges filed. The Hague Convention itself is premised on the trust courts place in their foreign counterparts to apply the law fairly relative to children who are the subject of a Hague case. It would be inconsistent to presume otherwise when courts apply their criminal law to parents accused of criminal wrongdoing.

Third, courts have made clear that parents who abscond with their children cannot then reap the benefit of pointing to inconvenience or disappointment that may result from repatriating children from the country to which they had grown accustomed following the wrongful removal. See Friedrich v. Friedrich ("Friedrich II"), 78 F.3d 1060, 1068 (6th Cir. 1996). Accordingly, Julie cannot claim that the personal loss she may feel by the children's leaving Michigan warrants a stay of the very order that returns the children to their country of habitual residence from which they were wrongfully taken.

At oral argument, Julie's attorney made a number of additional arguments, not presented in Julie's motion, which the Court pauses briefly to address. Among those arguments was a concern that Steven would not return the children to Michigan should Julie prevail on appeal, on the theory that Mexico has been found by the State Department to be a country that does not return children. Significantly, there has been no evidence presented to the Court substantiating this. Regardless, the Court does not believe this is a legitimate issue. Steven, like Julie, is a U.S. citizen subject to the jurisdiction of this Court and other U.S. authorities, and he works for a U.S. employer. Should Steven be disinclined to comply with any order to return the children to Michigan, the Court has resources at its disposal to enforce any such order, including contempt

17

fines or other sanctions that could be collected through Ford Motor Company, Steven's employer.

Counsel also posited that return to Mexico, the site of the December 26, 2014 trauma, will trigger both Julie and the children's PTSD. Regarding any harm to the children, as the Court already has explained, the independent psychologist appointed by the Court, Dr. Haynes, concluded that the children were not exhibiting symptoms of PTSD. And no mental health professional — not even Julie's own therapist Chuck Snyder — has opined that her return to Mexico would trigger a recurrence of her PTSD. These allegations of irreparable harm are simply unsubstantiated.

Accordingly, this factor weighs against a stay.

### C. Substantial Injury to Other Interested Parties

Julie asserts that given the expedited nature of the appeal process for Hague cases, a stay will not appreciably add to the amount of time the children have already been away from Mexico, and Steven's desire to have them return sooner rather than later is minimal in comparison to the harm she faces upon return. Resp't Mot. at 20. The Court agrees that a minimal delay will not substantially prejudice Steven. However, the Court has already allowed for this minimal delay, by adjourning the return date from June 30 to July 27, thereby allowing the instant motion to be fully adjudicated and to permit the Sixth Circuit an opportunity to meaningfully consider an emergency motion for a stay should Julie's counsel file one. There is no justification for an extended stay pending exhaustion of the appellate process.[13]

---

[13] In an effort to show that delay will not significantly harm Steven, Julie contends that he delayed instituting this action for some six months after the children's removal from Mexico. Resp't Mot. at 20. The Court disagrees. Steven attempted to initiate return of the children by filing a petition in the Mexican courts, in accordance with the Hague Convention, on March 17, 2015 — a little over two months after their removal. See Pet'r Ex. 2.8. On April 13, 2015, the Central Authority in Mexico transmitted a request to the United States Department of State for

18

**D. The Public Interest**

Finally, Julie posits two public interest concerns that she claims favor a stay: (i) ensuring that a full and proper adjudication of the issues on appeal is not undermined or compromised by a "hasty return"; and (ii) the issue of domestic violence and how it should be treated under the Convention. Resp't Mot. at 20.

First, Julie's motion does not explain how the children's return could somehow undermine or compromise appellate review of this matter. The Court perceives no reason why the Sixth Circuit cannot fully adjudicate the relevant issues, even if the children are in Mexico.

Second, it is undoubtedly true that there is a public interest in preventing domestic violence and protecting its victims — direct and indirect. However, this interest is taken into account under the Hague Convention through the "grave risk" defense and with the use of undertakings, where appropriate. If a removing parent fails to satisfy the standard required under the Convention, she cannot then undercut the Convention by prolonging any return order until the appellate process is completely exhausted. The goal of the Convention is to rectify the wrongful taking of children as promptly as possible, taking into account any relevant harm that may result to the children from the return. Julie cannot now, in the guise of a stay motion,

---

return of the children. Pet'r Ex. 3. This action was then filed on June 2, 2015. Steven's efforts do not suggest any lack of diligence, nor do they support an argument that further delay will not prejudice him; otherwise, any petitioner following the protocols of the Convention, which necessarily take some time, would find his or her efforts unfairly converted into evidence of no prejudice from delay.

 The remainder of the delay in this case is also not attributable to Steven and cannot be used against him. Several months were consumed while the parties explored settlement, at the Court's urging. An additional block of time was consumed by Dr. Haynes's evaluation of the five members of the Neumann family, an undertaking that both parties urged the Court to adopt. Preparation for, and conduct of, the nearly week-long evidentiary hearing also consumed considerable time. Then post-hearing briefing was delayed because of the medical condition of one of the attorneys. None of these circumstances can fairly be used to argue that further delay will not prejudice Steven.

impede the interest in a prompt return of wrongfully removed children by invoking concerns of child abuse and domestic violence when the record, developed after an extensive evidentiary hearing, fails to support her overbroad charges. While courts must be vigilant in protecting against both domestic violence and child abuse, the international abduction of children is also a scourge that must be battled and vanquished. The public interest is best served by court action that accounts for these competing concerns through a thorough and prompt adjudication before children are returned to the country from which they were taken. The Court believes that type of adjudication has already been conducted here.

The public interest does not weigh in favor of a stay pending appeal.

## II. CONCLUSION

For the reasons stated above, Respondent Julie Neumann's motion to stay (Dkt. 67) is denied.

SO ORDERED.


Dated: July 11, 2016　　　　　　　　　s/Mark A. Goldsmith
Detroit, Michigan　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 11, 2016.

　　　　　　　　　　　　　　　　　　s/Karri Sandusky
　　　　　　　　　　　　　　　　　　Case Manager