UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN MICHAEL NEUMANN,

              Petitioner,                                      Case No. 15-cv-11995

vs.                                                  HON. MARK A. GOLDSMITH

JULIE ANN NEUMANN,

              Respondent.

_____/

**OPINION & ORDER**
**DENYING PETITION FOR RETURN OF CHILDREN UNDER THE HAGUE**
**CONVENTION (Dkt. 1) AND DENYING PETITIONER'S MOTION TO FILE**
**SUPPLEMENTAL COMPLAINT AND GRANT EMERGENCY RELIEF (Dkt. 88)**

      This matter is before the Court after remand from the United States Court of Appeals for

the Sixth Circuit. This Court had earlier granted Steven Michael Neumann's petition under the

Hague Convention for the return to Mexico of two of his three minor children, who had been

wrongfully taken by his wife, Respondent Julie Ann Neumann.[1] See Neumann v. Neumann, 187

F. Supp. 3d 848, 851 (E.D. Mich. 2016), vacated, 684 F. App'x 471 (6th Cir. 2017). During the

course of the appeal, Steven was reassigned by his employer from Mexico to Michigan — a

"material change of circumstance" that the Sixth Circuit instructed must be explored by this Court

on remand. Neumann, 684 F. App'x at 473. Other than affirming this Court's ruling that Mexico

is the children's country of habitual residence and that Julie violated Steven's custodial rights by

removing them to the United States, the Sixth Circuit declined to rule on any of the affirmative

defenses raised by Julie, and remanded the matter to this Court. The court characterized its remand

_____

[1] During the course of the initial proceedings in this Court, JMN turned sixteen years old, Tr. Vol.
1 19:9-19:10 (Dkt. 44), which meant that she was no longer subject to the Hague Convention, see
Hague Convention, art. 4. As a result, only JSN and MKN are subject to these proceedings.

as "general," ordering that this Court once again consider whether ordering return would expose the children to a grave risk of physical or psychological harm. The court also ordered the Court to consider whether, in light of Steven's relocation to Michigan, the children would be exposed to an otherwise intolerable situation due to the potential inability of Mexican courts to adjudicate custody. Since that time, discovery has been conducted; the parties and children have been reexamined by a court-appointed psychologist; the Court has held an evidentiary hearing and in-camera interviews; and extensive briefing has been submitted on all of the relevant legal issues. The Court has also been presented with a motion by Steven in which he seeks to enforce Mexican court orders granting him parenting time. For the reasons stated below, the Court denies both Steven's petition (Dkt. 1) and his motion to file a supplemental complaint and for other emergency relief (Dkt. 88).

## I. BACKGROUND

### A. Prior Proceedings

Having lived their entire lives in Michigan, Steven and Julie were married in Michigan in 1997 and had three children: JMN, JSN, and MKN. Pet. ¶¶ 6-9 (Dkt. 1). The family lived together in Michigan until February 2011, when they moved to Mexico after Steven was assigned a new position by his employer, Ford Motor Company. Neumann, 187 F. Supp. 3d at 853. The assignment was originally scheduled to end in 2014, but was subsequently extended until 2017. Id.

As discussed in the Court's prior opinion, Julie fled to the United States with the three children after a traumatic domestic dispute in December 2014. Id. at 852. Steven subsequently filed a petition in this Court, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, seeking an

order directing Julie to return the children to Mexico. On May 17, 2016, this Court granted Steven's petition, holding that, at the time of the decision, Mexico was the children's country of habitual residence and that, despite Steven's behavior prior to his family's departure from Mexico, Julie had not demonstrated by clear and convincing evidence that the children would be subject to a grave risk of harm or an intolerable situation. Neumann, 187 F. Supp. 3d at 855, 868. The Court also held that Julie failed to demonstrate that (i) the children genuinely objected to return; (ii) they possessed the maturity to make any objections; or (iii) that Steven consented to their removal from Mexico. Id. at 857-860. The Court ordered Julie to return the children to Mexico by June 30, 2016. Id. The Sixth Circuit stayed that order pending appeal. See 7/22/2016 Sixth Circuit Order (Dkt. 74).

During the December 1, 2016 oral argument in the Sixth Circuit, Steven's counsel stated that Steven had recently relocated to Michigan. This development, characterized as a "material change in circumstances" by the Sixth Circuit, figured prominently in that court's opinion. Neumann, 684 F. App'x at 473. It upheld this Court's ruling that Mexico was the children's country of habitual residence, and that Julie had violated Steven's custodial rights when she took the children to Michigan on December 28, 2014. The court then framed its remand as follows:

> Our remand is otherwise general. The district court should determine whether or not clear and convincing evidence shows that returning the children now presents a "grave risk" of "physical or psychological harm" or "an intolerable situation." If so, then the district court has discretion to deny return, or to grant return subject to undertakings that would substantially lessen the risk. If the court determines that there is not a sufficient showing of a grave risk, the court should order return.

Id. at 484 (citing Simcox v. Simcox, 511 F.3d 594, 604–611 (6th Cir. 2007)).

**B. Steven's Domicile**

Following issuance of the Sixth Circuit's mandate, this Court convened a status conference with the parties. At the conference, the Court expressed its uncertainty regarding its continued jurisdiction in light of Steven's relocation to Michigan. In light of this uncertainty, the Court ordered that the parties engage in limited discovery for the purpose of determining whether the Court still has jurisdiction. The Court also ordered that the parties submit supplemental briefing regarding that issue. See 5/26/2017 Order (Dkt. 89).[2]

At his deposition, Steven testified that after being reassigned to Ford's Michigan headquarters, Ford cancelled the lease on his apartment in Mexico. Steven Dep., Ex. 11 to Resp. Br., at 28 (Dkt. 93-12). Upon returning to Michigan, he stayed in a hotel in Dearborn for several weeks. Id. at 29. He then briefly moved in with his parents before purchasing a condominium in Macomb Township. Id. In order to purchase the condominium, Steven obtained a mortgage. Id. at 38-40. In his mortgage agreement, Steven warranted that he would maintain the condominium as his principal residence for at least one year after beginning occupancy. Id. at 40-41. Steven also executed a principal residence affidavit, in which he swore that the condominium was his primary residence. Id. at 43-44. The document defines the term "principal residence" as "the dwelling that you occupy as your permanent home[.]" Steven. Aff., Ex. 9 to Resp. Br., at 3 (cm/ecf page) (Dkt. 93-10).[3] By certifying that the condominium is his principal residence, Steven is entitled to a percentage exemption from certain property taxes. While he initially described the

---

[2] In its order, the Court directed Julie to submit her brief on jurisdiction by July 7, 2017. Julie timely submitted her brief (Dkt. 92), but filed an amended brief two days after the deadline (Dkt. 93). Steven subsequently filed an objection to this late-filed amended brief (Dkt. 94). The amended brief caused no prejudice to Steven; thus, there is no basis for striking it.

[3] The supplemental briefing indicates that, following his deposition, Steven filed a request to rescind principal residence exemption. See Pet. Br. at 4 (Dkt. 120).

condominium as merely an "investment," he noted that he purchased it because he could no longer afford paying the monthly room charge at the hotel in Dearborn. <u>Id.</u> at 38, 40.

When asked if he considers the condominium to be his primary residence, he stated his belief that he has "more than one principal residence." <u>Id.</u> at 41. He stated that his condominium in Michigan is his primary residence in the United States, and an apartment he rents in Mexico is his primary residence in that country. <u>Id.</u> Steven stated that he began leasing the apartment in January 2017 from an individual he met through a friend. <u>Id.</u> at 31. He described a casual arrangement with the individual, noting that there is no written lease or fixed term. <u>Id.</u> He stated that he pays her in cash, and that she is essentially free to order him to vacate if she finds a higher-paying tenant. <u>Id.</u> at 33; <u>see</u> <u>also</u> <u>id.</u> ("I'm sure based on our handshake, that if she found another renter that was going to pay more, she would probably confront me first to say hey, we have an opportunity to rent this for more."). While he stated that he occasionally works remotely from the apartment, he primarily uses the apartment while traveling to Mexico as a tourist. <u>Id.</u> at 32. In the seven months prior to his June 2017 deposition, Steven had spent a total of fifteen days in Mexico. <u>Id.</u> He also stated that his physician and his place of worship are located in Michigan. <u>Id.</u> at 54-55. Steven also stated that he does not have a Michigan driver's license; he uses his Mexican license while operating his company car. <u>Id.</u> at 55-56.

After reviewing the parties' briefing, as well as the transcript of Steven's deposition, the Court ordered an evidentiary hearing on the issue of Steven's domicile. Steven, as well as his current and past supervisors at Ford, testified regarding Steven's ability to work in Mexico while stationed in Michigan. Janak Chitalia, Steven's supervisor from December 1, 2016 to November 1, 2017, testified that Steven was not permitted to work at a location outside of the Dearborn office without Chitalia's prior consent. 11/20/2017 Hr'g Tr. at 49 (Dkt. 118). Both Steven and Chitalia

testified that, prior to working remotely during a March 2017 trip to Mexico, Steven had to receive Chitalia's permission. Julie also submitted a document memorializing Ford's policy regarding remote work, which supports Chitalia's testimony that Steven is not permitted to work remotely without permission. See 10/18/2016 Ford Guidelines, Ex. 2 to 11/20/2017 Hr'g, at 1.

The Court also heard testimony from Greg Kuhn, Steven's current supervisor. Kuhn testified that Steven continues to work in Dearborn, and that he will remain in that location indefinitely. 11/20/2017 Hr'g Tr. at 62. He stated that he and Steven have not had any discussions regarding Steven working from Mexico, and that Steven has not made any formal requests to work there. Id. at 62. Kuhn also testified, like Chitalia, that Steven would need his permission prior to working remotely. Id. at 65.

Steven testified that upon learning that he was being transferred back to Dearborn, he spoke with Ryan Hazel, a manager on Ford's digital innovation team. Id. at 24. Hazel informed Steven that his assignment in Dearborn could be performed in Mexico if the children were ordered returned to Mexico. Id. However, Hazel is not, and was never, Steven's supervisor, nor is he on the same team with Steven. Thus his authority to make any decisions regarding Steven's ability outside of Michigan does not appear supportable. Further, there is no writing indicating that Steven would be allowed by Ford to permanently relocate to Mexico should the children be ordered returned. Id.

### C. Evaluation of the Children

#### 1. Dr. Haynes

In addition to conducting an evidentiary hearing on the issue of Steven's domicile, the Court appointed Dr. Jack Haynes, Ph.D., as an evaluating psychologist and expert witness, see 11/13/2017 Order (Dkt. 111), the role he had played earlier in the case. The Court charged Dr.

Haynes with evaluating the parties and the minor children, as well as interviewing the eldest daughter, who is no longer subject to the Convention. The Court directed Dr. Haynes to formulate opinions on the following issues: (i) whether the minor children genuinely object to being returned to Mexico and the extent to which they had attained an age and degree of maturity at which it is appropriate to take account of their views; (ii) whether there is a grave risk that return of the children would expose them to physical or psychological harm or otherwise place them in an intolerable situation; (iii) any subsidiary issues that he believes bear on these primary issues, such as the mental health, sobriety, or alienation actions of Steven and/or Julie; and (iv) the impact parenting time would have on the children, either as ordered by the Mexican court or under other terms and conditions as Dr. Haynes might propose. See id.; see also 11/21/2017 Order (Dkt. 115). The first three issues pertain to affirmative defenses to return raised by Julie, i.e., that the children object to return and that return would pose a grave risk of physical or psychological harm to the children, or an otherwise intolerable situation.

The Court ordered Dr. Haynes to formulate an opinion on the last issue in light of Steven's pending motion to file a supplemental complaint (Dkt. 88). In that motion, he seeks to enforce orders of the Mexican court granting him parenting time from 9:00 a.m. Saturday to 7:00 p.m. Sunday every other weekend, and from 4:00 p.m. to 8:00 p.m. on Tuesdays and Thursdays, during which time he and the children are to undergo reunification therapy. He also seeks relief beyond the Mexican court orders, i.e. "make-up parenting time," for the visitation time he has not had while the children have resided in Michigan.

Dr. Haynes subsequently conducted interviews with the parties and children and delivered a report to the Court on January 30, 2018, in which he summarized his findings. With regard to the first issue — whether the children object to return and are of sufficient age and maturity — Dr.

Haynes concluded that "[t]he children strongly and genuinely object." Dr. Haynes Report at 26. Their objections are based on the fact that a return to Mexico "would be disruptive to their school education and sports practice, training, and games." Id. Dr. Haynes stated that they also object because they no longer identify with Mexico, and because the return would be for an indeterminate time. Id. Regarding age and maturity, Dr. Haynes noted that the boys (one fourteen and one fifteen) "are more mature than most children their age," and that "they have demonstrated the maturity to have their views considered." Id. He also stated his belief that none of the children had been coached prior to their interviews. Id. at 15.

Dr. Haynes next opined on whether return to Mexico would expose the children to a grave risk of physical or psychological harm, or place them in an otherwise intolerable situation. He concluded that risk of harm is "significant," reasoning that that both parents live in the United States, and the boys are unable to provide for themselves alone in Mexico. Id. at 27. He noted that neither Julie nor Steven would be able to stay in Mexico for an extended period of time, and that it is unlikely the grandparents would be able to care for them in Mexico due to their advanced age. Id. Dr. Haynes also noted the physical risks posed by Mexico, including "well-publicized drug cartel problems and other types of crime." Id.

Dr. Haynes next addressed subsidiary issues bearing on the previous issues, such as the mental health, sobriety, or alleged alienating actions of the parties. He began by concluding that Steven's "essentially untreated substance abuse and its implications is a central issue in this situation." Id. The report notes that Steven does not attend Alcoholics Anonymous, or any other substance abuse treatment. His last known treatment occurred in January 2015, for a total of two days. Id. With regard to parental alienation, Dr. Haynes concluded that "[i]t did not appear that Julie engages in a campaign to alienate the children from their father. She clearly is negative about

him and the children know that, as they would in almost any other parallel situation." Id. at 28. Instead, Dr. Haynes concluded, "[m]ore persuasive about alienation have been the actions of Steve himself." Id. According to Dr. Haynes, this alienation resulted from several events, including the violent incident in Mexico, Steven's firing of a therapist during a reunification session with the children, and his lack of meaningful financial support to the family, despite his six-figure salary. Id.

Finally, with regard to the impact of parenting time, Dr. Haynes stated that "[f]ather-children reunification is desirable, but needs to be done properly and professionally." Id. at 29. Prior to enforcing any parenting time, Dr. Haynes recommends that Steven commit to a significant outpatient substance abuse treatment program. Id. Dr. Haynes also recommends that parenting time not occur until Steven and the children have had an opportunity to undergo reunification therapy. Id.

The Court subsequently allowed the parties to express their views on Dr. Haynes's report. See 2/1/2018 Order (Dkt. 127). Julie argues that it is clear from Dr. Haynes's report that both JSN and MKN genuinely object to return, and that they are mature enough for the Court to consider their views (Dkt. 129). She argues that these objections are a sufficient ground on which to deny return. Julie also agrees with Dr. Haynes's conclusion that returning the children to Mexico without appropriate supervision would expose them to a grave risk of harm. She also contends that returning the children to Mexico would expose them to an intolerable situation because the Mexican court does not have jurisdiction to resolve this matter. Finally, with regard to parenting time, Julie argues that this Court lacks jurisdiction to rule on such claims.

In his brief, Steven expresses his strong disagreement with Dr. Haynes's findings (Dkt. 130). Steven asserts that the children's objections to return are not borne of a mature comparison

between Michigan and Mexico, but rather are attributable to parental alienation and undue influence by Julie.  With regard to grave risk, Steven states that he advised Dr. Haynes that he would return to Mexico to live with the children, and work remotely.  Steven also disagrees with Dr. Haynes regarding his substance abuse and mental health treatment, and the related preconditions that Dr. Haynes recommends prior to allowing parenting time.

### 2. Court's In-Camera Interview

In addition to commissioning Dr. Haynes's report, the Court conducted an in-camera interview with each child.  During his interview, JSN adamantly objected to a return to Mexico. He stated that his high school in Michigan provides a much better education than the school he attended while in Mexico.  As an example, JSN stated that his Mexican school did not provide him with an in-depth understanding of mathematics.  JSN noted that while his Michigan school devotes a yearlong course to geometry, his school in Mexico devoted much less time before moving on to other subjects.  JSN expressed fear that the academics in Mexico would hinder his ability to get into college.  With regard to extracurricular activities, JSN stated that he is a member of both the football and basketball teams in Michigan, something his school in Mexico did not offer.  JSN felt this was significant because he hopes to earn a scholarship to play football in college, something that would not be possible if he was forced to relocate to Mexico.  JSN also noted that he has a much stronger support system in Michigan than he would have in Mexico.  He noted that he lives with his grandmother, mother, and brother in Michigan, and fears that he would have no one in Mexico in light of Steven's relocation to Michigan.

MKN also expressed a strong objection to being returned to Mexico.  He stated that leaving now would disrupt his education, athletics, and friendships he has made.  MKN also noted that the move would be disruptive to practicing his Catholic faith.  While he expressed some positive

feelings about his school in Mexico, he expressed a preference for his school in Michigan in light of the school's religious orientation. He stated that the family could not "keep up with our faith" while in Mexico because of the language barrier. In contrast, since moving back to Michigan, and enrolling at a Catholic school, he has felt much more connected to his religion. Beyond school, sports, and religion, MKN, like his brother, also emphasized the support system present in Michigan. He noted that he is very close with his siblings, grandmother, and other extended family. He also has a close group of friends who live nearby; he contrasted this with life in Mexico, where he often had to take lengthy bus rides to see friends. He also expressed fear of returning to Mexico in light of Steven's move to Michigan, as well as Steven's behavior during, and following the December 2014 incident. MKN stated that, despite Steven's claims to the contrary, he has not received treatment, and has not made a meaningful effort to reunify with MKN or his siblings.

Notably, both boys expressed intense emotions on a prospective return to Mexico. MKN stated that he found the situation "shocking" and "confusing." JSN shared a similar sentiment when he stated "if he wants to see us so bad, then why wouldn't he let us stay here."

### 3. Mexican Court Jurisdiction

The Court also instructed the parties to submit briefing setting forth their views on whether the Mexican court may exercise jurisdiction in the circumstances of this case, and if not, whether ordering return would expose the children to an intolerable situation. See 11/21/2017 Order (Dkt. 116). The Court allowed the parties to submit supporting materials, including an affidavit by an expert in the area of Mexican law setting forth his or her view on this issue. Id. The Court sought the briefing and materials in light of the Sixth Circuit's statement that "[t]he record does not show whether a Mexican court may exercise jurisdiction to resolve a custody dispute between two American citizens, none of whom are Mexican citizens, and none of whom reside in Mexico."

<u>Neumann</u>, 684 F. App'x at 482. The court also noted that "if Mexico as a practical or legal matter cannot or will not adjudicate custody, the intolerable situation exception to the obligation to return may apply." <u>Id.</u>

## II. ANALYSIS

### A. Jurisdiction

The Court begins by addressing the issue of subject-matter jurisdiction in light of Steven's relocation to Michigan. Julie contends that because both parties are domiciled in Michigan, this action is moot. "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 94 (1998) (quoting <u>Ex parte McCardle</u>, 74 U.S. 506 (1868)).

Julie relies on <u>Von Kennel Gaudin v. Remis (Gaudin I)</u>, 282 F.3d 1178, 1183 (9th Cir. 2002), which held that the Hague Convention "cannot be invoked when the petitioner moves permanently to the same country in which the abductor and the children are located." The court reasoned that "[t]he Convention does not extend to custody determinations, i.e., which parent should care for the child. Rather, the Convention is designed to decide which country should make the custody determination." <u>Id.</u> "In other words, the Convention presumes that the petitioner is located in a different country from that of the abductor and the child, such that multiple countries could potentially make a custody determination." <u>Id.</u> The court held that "when a petitioner relocates permanently to the same country in which the abductor and the children are found, she casts her lot with the judicial system of that country." <u>Id.</u> It stated that if the petitioner permanently moved to Hawaii, where the respondent and children were located, "her action is indeed moot." <u>Id.</u>

The Court does not find this reasoning persuasive. "Article III of the Constitution restricts the power of federal courts to 'Cases' and 'Controversies.'" Chafin v. Chafin, 568 U.S. 165, 171 (2013). "The case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate. [I]t is not enough that a dispute was very much alive when suit was filed; the parties must continue to have a personal stake in the ultimate disposition of the lawsuit." Id. (quotation marks omitted). A case is thus considered moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Pettrey v. Enter. Title Agency, Inc., 584 F.3d 701, 703 (6th Cir. 2009). "But a case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." Chafin, 568 U.S. at 172 (quotation marks omitted). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." Id.

In Chafin, the mother filed a Hague petition seeking return of the parties' daughter to Scotland. The district court granted the petition, and the mother subsequently removed the child to Scotland and initiated child custody proceedings. On appeal, the Eleventh Circuit held that an appeal of a return order becomes moot where the child has been returned to the foreign country. The court reasoned that it "became powerless to grant relief."

The Supreme Court disagreed. Although the Court did not address Gaudin, it effectively rejected the decision. It held that the dispute between the parties was "still very much alive," because the parties continued to disagree over the child's country of habitual residence and the applicability of the Convention's affirmative defenses. The court held that "[o]n many levels, the Chafins continue to vigorously contest the question of where their daughter will be raised." Id. at 173. The mother argued that the case was moot because the district court lacked authority under the Convention to issue a "re-return order." The Court disagreed, holding "that argument — which

goes to the meaning of the Convention and the legal availability of a certain kind of relief —

confuses mootness with the merits." Relying on its ruling in <u>Steel Co.</u>, the Court held that "Mr.

Chafin's claim for re-return — under the Convention itself or according to general equitable

principles — cannot be dismissed as so implausible that it is insufficient to preserve jurisdiction,

and his prospects of success are therefore not pertinent to the mootness inquiry." <u>Id.</u> at 174.

Julie's argument similarly confuses mootness with the merits. Steven still vigorously

contests where the two minor children should be raised and which country's courts should decide

the issue. As discussed <u>infra</u>, his relocation may affect the Court's analysis of the affirmative

defenses raised by Julie; but this does not mean that his move serves as a jurisdictional bar to

consideration of his Hague claims. Regardless of his move to Michigan, he still seeks an order

returning the children to Mexico, where he claims he will be able to move and work in the event

his petition is granted. As discussed below, Steven will not receive such an order — not for lack

of this Court's jurisdiction, but for lack of merit.

**B. Return Claim**

Turning to the merits of Steven's claim for return, "[t]he Hague Convention prohibits the

removal of a child, in breach of the rights of custody, from 'the State in which the child was

habitually resident immediately before the removal.'" <u>Simcox</u>, 511 F.3d at 602 (quoting Hague

Convention, art. 3). The Sixth Circuit has already affirmed this Court's ruling that Julie breached

Steven's custodial rights when she removed the children from Mexico, their country of habitual

residence.

"However, even if the removal was wrongful, the Court is not necessarily bound to order

return of the children." <u>Neumann</u>, 187 F. Supp. 3d at 853. The Convention contains certain

exceptions, two of which are at issue in this case: (i) the child objects to the return and is of a

sufficient age and degree of maturity that it is appropriate to take account of the child's views; and (ii) there is a grave risk that returning the child would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. Hague Convention, art. 13. The first exception need only be established by a preponderance of the evidence; the second requires clear and convincing evidence. 22 U.S.C. § 9003(e)(2); <u>Simcox</u>, 511 F.3d at 603–604.

## 1. The Children's Objections

The Court begins by determining whether the children object to return, and whether they are of sufficient age and maturity to have their views considered. Article thirteen of the Hague Convention states that "[t]he judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13.

Courts have distinguished between the "wishes" of a child and a child's objection, holding that wishes are associated with custody proceedings, and are thus not appropriate to consider in a Hague case. The court in <u>Hirst v. Tiberghien</u>, 947 F. Supp. 2d 578, 597 (D.S.C. 2013), held that courts "must distinguish between a child's objections as defined by the Hague Convention and the child's wishes as in a typical child custody case, the former being a stronger and more restrictive standard than the latter." (quotation marks and citations omitted); <u>see</u> <u>also</u> Response to International Parental Kidnapping: Hearing Before the Sen. Comm. on Criminal Justice Oversight, (1999) (statement of Catherine L. Meyer, British Embassy Co-chair of the International Centre for Missing & Exploited Children), 1999 WL 988418 (F.D.C.H) ("[T]he Convention is not intended as an instrument to resolve custody disputes per se. It follows, therefore, that the notion of 'objections' under Article 13b is far stronger and more restrictive than that of 'wishes' in a custody case."). In a similar vein, courts have required that children subject to the Convention set forth

particularized reasons why they object to return, as opposed to a generalized opposition. See Tsai-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259, 279 (3d Cir. 2007) ("The District Court found that Raeann's testimony did not include particularized objections to returning to Canada, but rather it indicated that she possessed a more generalized desire to remain in Pittsburgh similar to that of any ten-year-old having to move to a new location.").

The Court must also consider whether the children's views on return are the product of undue influence, or whether the length of the abduction enabled the children to become more comfortable in their new home. Id. at 279-280. Further, if a child's objection is the sole ground on which a court declines to order return, the court must examine the objection with more scrutiny than if the child's objection is "one part of a broader analysis under Article 13(b)." Blondin v. Dubois, 238 F.3d 153, 166 (2d Cir. 2001).

It is clear from Dr. Haynes's report, as well as the Court's own in-camera interviews with the children, that they both genuinely object to being returned to Mexico. The Court finds that the children's views are properly characterized as legitimate objections to being returned to Mexico, as opposed to a wish or preference to remain in Michigan. The boys both gave particularized reasons why they object to return, evidencing a thoughtful analysis about why they should remain in Michigan, and conversely, why Mexico would not be a good environment for them. In their meetings with Dr. Haynes, the boys discussed the stability of their life in Michigan, including, "their school education and sports practice, training, and games." Dr. Haynes Report at 26.[4] This

_____

[4] The Court notes that it previously held that the children's preference to stay in Michigan because of their sports teams was insufficient to constitute a genuine objection under the Convention. See Neumann, 187 F. Supp. 3d at 858. However, the Court's holding rested on the boys' failure to express any concern that they would suffer hardship by returning to Mexico. Id. Both boys now express genuine concerns regarding their welfare in Mexico in light of Steven's relocation to Michigan and his failure to engage in meaningful treatment. Further, they now provide detailed explanations of why staying in Michigan is beneficial to their education and the practice of their Catholic faith.

was reiterated to the Court during its in-camera interviews, where both boys expressed a strong desire for their Michigan school in light of its academics, athletics, and its devotion to their Catholic faith. They also focused on the support system present in Michigan, including their older sister, their grandmother, other extended family, and friends.

Their objection to removal from Michigan is strengthened by their statements regarding Mexico. In addition to noting that their school, sports, and faith would be disrupted by a return to Mexico, both boys noted that their father no longer lives in Mexico, and that it is unclear whether he would even be able to return there with them, in light of his relocation to Ford's Michigan headquarters. They both expressed fear of being sent back to Mexico without clarity regarding who would be responsible for them. Even if Steven was able to move to Michigan, the boys expressed concern regarding his ability to care for them in light of his failure to seek treatment or engage in meaningful reunification therapy with them.

Both of these fears, regarding the lack of supervision in Mexico and Steven's ability to care for them, are justified. Despite Steven's claims to the contrary, the Court holds that he is now domiciled in Michigan. "Establishment of a new domicile is determined by two factors: residence in the new domicile, and the intention to remain there." Von Dunser v. Aronoff, 915 F.2d 1071, 1072 (6th Cir. 1990). Determining an individual's domicile involves taking into account a variety of factors, including, but not limited to,

> Current residence; voting registration and voting practices; location of personal and real property; location of brokerage and bank accounts; membership in unions; fraternal organizations, churches, clubs and other associations; place of employment or business; driver licenses and other automobile registration; [and] payment of taxes.

<u>Persinger v. Extendicare Health Servs., Inc.</u>, 539 F. Supp. 2d 995, 997 (S.D. Ohio 2008) (quoting 13B Charles A. Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice and Procedure § 3612 (2d ed. 1984)).

A review of the record makes clear that Steven is domiciled in Michigan. He was reassigned to Ford's Michigan office in November 2016. There is no indication that this was a temporary reassignment with plans to return him back to Mexico. Kuhn, Steven's current supervisor, testified that Ford intends for Steven to remain at the company's Dearborn headquarters indefinitely. Steven's actions following his transfer demonstrate as much. On December 27, 2016, he purchased the condominium in Macomb. In connection with the purchase, he signed mortgage documents in which he warranted that the condominium would serve as his primary residence. He also executed a principal residence exemption affidavit, which allows him to be exempted from paying a certain percentage of his property taxes. There is also evidence that Steven has bank accounts in Michigan, his primary care physician is located in Michigan, and that he attends a church in Michigan. All of these factors evidence Steven's intention to remain in his Michigan residence.

This conclusion is bolstered when comparing Steven's connection to Mexico. He notes that he still has a Mexican driver's license, a Mexican bank account, and an apartment in Mexico. However, Steven's use of the apartment is limited at best. He testified that he rents the apartment on a handshake basis. There is no written lease, and the landlord is free to rent the unit to a higher-paying tenant. While he claims to use the apartment to occasionally do work remotely, he conceded that, since relocating to Michigan, he spends much of his time in Mexico as a tourist. Chitalia, Steven's former Ford supervisor, testified that Steven worked remotely from Mexico once in March 2017, but that this assignment required his approval. It is also clear from Ford's

telecommuting policy that any future remote work could not be done without that same approval. Significantly, Steven has spent very little time in Mexico since he was reassigned to Michigan at the end of 2016. In the seven months prior to his June 2017 deposition, he spent a total of fifteen days in Mexico. With the exception of a bank account and driver's license, there does not appear to be any other evidence substantiating Steven's claim that he permanently resides in Mexico and is domiciled there. Steven's connections to Michigan — his condominium, employment, place of worship, bank accounts, physician, and intent to file tax returns — lead to the conclusion that he is domiciled in Michigan.

The children thus have a well-grounded fear that they will be returned to a country that their father has vacated. While Steven has indicated that he would relocate to Mexico if the Court orders return of the children, this does not meaningfully assuage their fear. There is no assurance that Steven will apply to Ford for permission to work permanently in Mexico. And there is no assurance that Ford would allow such an arrangement. His supervisors made it clear that he is assigned indefinitely to Michigan. Steven acknowledged as much when he told Dr. Haynes that he was "owned" by Ford of Dearborn, and had merely been "leased" to Mexico when he was on assignment there. Dr. Haynes Report at 10.

Even if Steven could work remotely from Mexico for more than a limited period of time, it is unclear what suitable supervision arrangements for the children he could make when he would inevitably have to return to Michigan for work. Steven's job appears to be a demanding one, based on the description of his responsibilities and the compensation that he receives. He will undoubtedly be called back from time to time to Michigan to perform essential tasks. The children can reasonably question what guarantees are in place that a responsible adult will be present in Mexico to supervise them and attend to their needs.

The children's fear regarding his ability to care for them is also supported by the record. They both noted in the Court's in-camera interviews that Steven has not sought meaningful treatment since the December 2014 incident. This is supported by Dr. Haynes's report. The report states that "Steve's essentially untreated substance abuse and its implications is a central issue in this situation." Dr. Haynes Report at 27. Dr. Haynes notes that Steven has not attended Alcoholics Anonymous or a similar group, and has not dealt with any substance abuse professional. Id. His only attempt at treatment was a two-day stint in January 2015; he left the facility against the advice of medical professionals. Id. While Steven claims to have stopped drinking since the explosive encounter with Julie in December 2014, Dr. Haynes warns that even if that is to be believed, Steven's lack of treatment presents a continuing danger. Id. ("Steve's essentially untreated alcoholism, which has been displayed in a history of cyclical binging substance abuse patterns, raises a clear and ongoing risk of relapse, with significant results not only to Steve but to the children and to Julie.").

Finally, the Court notes that there is no evidence that the boys' objections are the product of undue influence by Julie, or that Julie engaged in parental alienation. Steven argues that Julie has engaged in numerous acts of parental alienation, including refusing to allow Steven to see the children, and misrepresenting his financial support. He also argues that the objections are the product of undue influence, given that the children have been in Julie's custody for more than three years.

Steven cites the court's statement in Hirst that "a mature child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child." Hirst, 947 F. Supp. 2d at 597-598 (quotation marks and citation omitted). The court held that "[u]ndue influence may not be

intentional, but simply the inevitable product of an ongoing custody battle between two parents," and "the very fact of a lengthy wrongful retention could enable the child to become comfortable in his or her new surroundings." Id. at 598 (quotation marks and citation omitted). The court concluded that "[a]llowing the influence of an abducting parent to taint the child's preference, either by virtue of statements made to the child or by virtue of the lengthy wrongful retention would frustrate the Convention's overarching purpose of preventing the abducting parent from obtaining custody by means of a wrongful removal." Id.

The Court is mindful that crediting children's objections after they have been wrongfully retained for an extended period may incentivize other parents to wrongfully retain their children for as long as possible. However, there is simply no credible evidence in the record that the passage of time, or any alleged parental alienation by Julie, is the reason for the children's objections to return. Dr. Haynes concluded, after evaluating all three children, that none of them had been coached prior to their meetings with him. He ultimately concluded that "it did not appear that Julie engages in a campaign to alienate the children from their father." Id. at 28. If anything, Dr. Haynes noted, the actions of Steven, including his firing of a reunification therapist in front of the children and inconsistent financial support, have caused the children to feel alienated from him. Id.

The Court also did not detect any evidence of undue influence or parental alienation during its in-camera interviews with the boys. They both provided detailed reasons why they objected to return, none of which appeared rehearsed, or related to the passage of time. See Bowen v. Bowen, No. 2:13-CV-731, 2014 WL 2154905, at *16 (W.D. Pa. May 22, 2014) (noting the Third Circuit's warning that an extended wrongful retention can encourage objections, but holding that "the record is devoid of any indication that the passage of time generated [the child's] desire to remain in the

country of his birth, or that the passage of time was going to change or is going to change [his] desire to remain in the country of his birth.").

The Tenth Circuit's ruling in de Silva v. Pitts, 481 F.3d 1279 (10th Cir. 2007), supports the Court's decision to credit the children's objections. The court affirmed the magistrate judge's ruling that the child had a made a considered decision when he objected to leaving Oklahoma to return to Canada. The court noted the child's statements that he attended a good school in Oklahoma, participated in the school's football and wrestling teams, and felt comfortable in the home where he lived. The boys in this case have provided the same objections, but considerably more, as well. They both stated that their current high school provides them with a better education than their Mexican school, will increase their chances of getting into a good college, and enhance their religious faith.

Having found that the boys genuinely object to being returned, the Court must determine whether they are of sufficient age and maturity, such that it is appropriate for the Court to take account of their views. The Court holds that the boys are now clearly of a sufficient age and maturity level that it must take into account their objection to return. JSN and MKN are currently fifteen and fourteen, respectively; this places them at the upper end of the Hague Convention, which ceases to apply to children aged sixteen or older. Courts have recognized that "it would be very difficult to accept that a fifteen-year-old should be returned against its will." Felder v. Wetzel, 696 F.3d 92, 101 (1st Cir. 2012) (quoting Elisa Pérez–Vera, Explanatory Report: Hague Conference on Private International Law ¶ 30, in 3 Acts and Documents of the Fourteenth Session 426, 433 (1980)).

While the age and maturity exception is a fact-intensive inquiry that may result in some fifteen year olds being returned against their will, this is not such a case. Dr. Haynes states in his

report that "the boys are more mature than most children their age." Dr. Haynes Report at 26. The Court agrees. During its interviews, the Court found the boys to be kind, respectful, and intelligent. They answered each of the Court's questions, providing thoughtful answers when asked whether they objected to return.

What struck the Court most forcefully in establishing both the maturity of the children and the genuineness of their opinions was their utter puzzlement over their father's continued efforts to force them to relocate to Mexico when he has moved to Michigan. MKN told the Court in the in-camera interview that he finds this "shocking" and "just confusing." JSN expressed a similar sentiment, stating that "if he wants to see us so bad, then why wouldn't he let us stay here?" Such sentiments are eminently reasonable, given what they are experiencing — a father who wants to force them to return to a country that they view as foreign, even though he has relocated to their community where they are thriving and the entire family resides. Under these circumstances, bewilderment and the self-awareness to recognize that emotion are good evidence of maturity and sincerely held beliefs.

In light of all fact and circumstances, the Court holds that Julie has shown by a preponderance of the evidence that the boys genuinely object to return, and that they possess sufficient maturity to take account of those opinions. As a result, the Court finds this basis, by itself, sufficient grounds for declining return of the children.

### 2. Grave Risk of Harm

In light of the Sixth Circuit's ruling in this case, the Court will also address the issue of grave risk. In its opinion remanding the case to this Court, the Sixth Circuit stated that the Court "should determine whether or not clear and convincing evidence show that returning the children now presents a 'grave risk' of 'physical or psychological harm' or 'an intolerable situation.'"

Neumann, 684 F. App'x at 484. If the Court finds such a risk exists, it "has discretion to deny return, or to grant return subject to undertakings that would substantially lessen the risk.'" Id. (citing Simcox, 511 F.3d at 604-611).

The Court finds that, in addition to proving by a preponderance of the evidence that the children genuinely object to return, Julie has proven by clear and convincing evidence that ordering return would expose the children to a grave risk of physical or psychological harm. The Court previously held that neither Steven's untreated alcoholism, nor his alleged domestic abuse on December 26, 2014, were sufficient to expose the children to a grave risk of physical or psychological harm. See Neumann, 187 F. Supp. 3d at 868. The Court need not reexamine these conclusions.

Instead, the Court's finding of grave risk rests on the uncertainty the children would face in Mexico following Steven's permanent relocation to Michigan. If the Court were to order return under the present circumstances, it would be ordering them to live in a country with no parental supervision. The Court believes it obvious why such an order would place the boys in grave risk of harm: they would be forced to navigate a foreign country, where they do not fluently speak the language, all while under the age of sixteen. While the Court believes the children are now mature enough to object to return, it certainly does not believe the boys are capable of providing for themselves abroad.

Steven's counter to this is that if the boys are ordered return, he will return to his apartment in Mexico and work remotely for Ford. The Court does not put much weight in this assurance. The Court must decide the case on the facts before it, not some event that may occur in light of the Court's ruling. Even if the Court took Steven at his word, it seems unlikely that Steven would be permitted by Ford to work in Mexico for any significant period of time. Testimony by his

supervisors indicates that he is permanently stationed in Michigan, and that any remote work must be cleared beforehand.  If securing such permission were easy, Steven would surely have produced evidence that Ford would agree to such an arrangement.  Steven produced no such evidence. Indeed, Steven testified at his deposition that he has never requested to be reassigned to Mexico. Steven Dep. at 23.

Even assuming he were to receive permission to work remotely for an extended period, constant travel to and from Michigan would leave the children without adequate supervision.  See Dr. Haynes Report at 27 ("Neither parent likely would be able to go for an extended time . . . The grandparents may be too advanced in age for that.  For example, Julie's mother is 85.  It would seem odd to try to enlist someone in the extended family.").  Steven's connection to Mexico is simply too tenuous to allow the children to be returned.  A return order would assuredly place the boys in harm's way.

After a finding of grave risk, "some courts have exercised the discretion given by the Convention to nevertheless return the child to the country of habitual residence, provided sufficient protection was afforded."  See Simcox, 511 F.3d at 605.  These protections are known as "undertakings," defined as "enforceable conditions of return designed to mitigate the risk of harm occasioned by the child's repatriation."  Id.  They are usually imposed during "the time period between repatriation and the determination of custody by the courts in the child's homeland."  Id. at 607.  However, "[a] particular problem with undertakings . . . is the difficulty of their enforcement."  Id.; see also id. ("There is currently no remedy for the violation of an undertakings.") (quotation marks and citation omitted).

This problem is magnified in this case, where any undertaking would be centered on requiring Steven to move back to Mexico permanently.  Courts have recognized that, aside from

the difficulty of enforcement, such an order may be constitutionally doubtful. See Id. at 610 (noting that an order requiring the parent to return to Mexico may violate the constitutional right to travel) (citing Fabri v. Pritikin-Fabri, 221 F. Supp. 2d 859, 873 (N.D. Ill. 2001)). The Court does not believe that there are any enforceable undertakings that could substantially lessen the risk of harm that would befall the children if ordered returned to Mexico. As a result, the Court declines to order undertakings.

### 3. Intolerable Situation

The Court must also determine whether return would expose the children to an "intolerable situation." In its opinion remanding this case, the Sixth Circuit noted that "[t]he record does not show whether a Mexican court may exercise jurisdiction to resolve a custody dispute between two American parents over two of their three American children, all of whom are American citizens, none of whom are Mexican citizens, and none of whom reside in Mexico." Neumann, 684 F. App'x at 482. The court raised the possibility that "if Mexico as a practical or legal matter cannot or will not adjudicate custody, the intolerable situation exception to the obligation to return may apply." Id.

As support for this proposition, the court pointed to its prior decision in Pliego v. Hayes, 843 F.3d 226 (6th Cir. 2016). Pliego involved a dispute over a child born to an American mother and a Spanish father, who served as a diplomat in Turkey. After the mother fled to Kentucky, the father filed a Hague petition. As a defense to return, the mother argued that return would expose the child to an otherwise intolerable situation, because Turkish courts could not properly adjudicate custody or protect the child in light of the father's diplomatic immunity and undue influence over the Turkish courts, and because of his prior abuse.

After the district court rejected this argument, the mother appealed to the Sixth Circuit. The court of appeals considered whether the phrase "intolerable situation" can be extended to "encompass situations where the courts of the state of habitual residence are practically or legally unable to adjudicate custody." Id. at 232. Prior to Pliego, the cases that discussed intolerable situations were limited to instances of sexual abuse or civil instability in the child's country of habitual residence. Id. After examining the text of the Convention, its object and purpose, as well as decisions of foreign courts, the court held that an "intolerable situation" extends to the country of habitual residence's inability to adjudicate custody. The Court ultimately held that, despite this holding, the mother could not demonstrate that the Turkish courts were incapable of adjudicating custody and protecting the child.

Like the court in Pliego, this Court is faced with the issue of whether a foreign court is able to adjudicate custody. The Court must determine whether Mexico "as a practical or legal matter," Neumann, 684 F. App'x at 482, can adjudicate custody in light of Steven's new domicile in Michigan. To resolve this issue, the Court instructed the parties to submit briefs addressing "whether the Mexican court may exercise jurisdiction in the circumstances of this case, and if not, whether ordering return would expose the children to an intolerable situation." The Court also permitted the parties to attach affidavits by experts in the area of Mexican law setting for their views on this issue. See 11/21/2017 Order (Dkt. 116).

Julie sets forth several reasons why the Mexican court lacks jurisdiction over both the divorce complaint and custody matters. Relying on the affidavit of Gregorio Mariano Nunez Gonzalez, a Mexican attorney and law professor with extensive experience in family law, Julie argues that the Mexican court lacks jurisdiction over the divorce because Steven failed to obtain a "permission certificate," a document non-Mexican citizens must obtain from immigration

authorities that authorizes a change in marital status. She also argues that there is no jurisdiction because "there is no proof in the affidavits of service that Mrs. Neumann received actual notice of the Mexican proceedings," as required by the Inter-American Convention on Letters Rogatory or the Hague Service Convention. Resp. Br. at 3.

In response, Steven relies on the affidavit of Manuel Nino de Rivera Hermosillo, the family law attorney representing Steven in the Mexican court. With regard to the permission certificate, Hermosillo states that "[a]s a permanent resident of Mexico since January 28, 2015," Steven had the rights of a Mexican citizen, and thus did not need to obtain a permission certificate prior to filing for divorce. Hermosillo Aff., Ex. 1 to Pet. Resp., ¶ 17 (Dkt. 124-2). Hermosillo also disputes that Julie was not properly served with notice of the proceedings. He notes that service was made at Julie's residence on two occasions to her mother and brother, after several unsuccessful attempts to personally serve Julie. Id. ¶ 16. Hermosillo also states that the Mexican court deemed the service to the brother proper, and subsequently entered a dissolution of marriage. Id.

Julie also argues that, even if the Mexican court had jurisdiction to adjudicate the divorce complaint, the jurisdiction would not extend to custody adjudication. In support, she relies on Gonzalez's contention that the divorce complaint lacks a demand for custody. Gonzalez Aff., Ex. 1 to Resp. Br., ¶ 6 (Dkt. 123-2). Gonzalez also invokes the doctrine of patria potestas, which prevents Mexican courts from making orders that "negatively impact the rights and duties of parents not subject to the jurisdiction of the Mexican courts." Id. Hermosillo counters that the doctrine "is not relevant to the facts of the case, where no request has been made that could negatively impact Julie Neumann's right of patria potestas." Hermosillo Aff. ¶ 18. With regard to the lack of custody demand, Hermosillo cites to the first clause of Steven's divorce petition, which requests that he "shall have care and custody of the minors." Id. ¶ 20.

Based on Hermosillo's affidavit, it is at best unclear whether any of the procedural issues identified by Julie are sufficient to divest the Mexican court of jurisdiction to adjudicate custody. Under the Convention, Julie has the burden to prove by clear and convincing evidence that return would place the children in an "intolerable situation." The parties submitted competing affidavits, neither of which was clearly more persuasive than the other. Because it is Julie's burden on this issue, the Court concludes that she has not shown an intolerable situation in light of the Mexican court's inability to adjudicate custody. This does not represent a finding that the Mexican court has jurisdiction — only that Julie has not shown that it does not.

In any case, Julie's failure to sustain the "intolerable situation" defense does not impact the ultimate disposition in this case. As stated above, the Court declines to order return based on the children's objections, and based on the grave risk of harm they would face upon return to Mexico.

### C. Access Claim

This ruling on return does not end the case. In addition to seeking return, Steven now requests that the Court enforce orders by the Mexican court granting him parenting time. On May 19, 2017, Steven filed a motion to file a supplemental complaint and for emergency relief. In this motion, Steven requests that the Court enforce orders entered by the Mexican court on April 7, 2017, and April 26, 2017. These orders granted Steven parenting time every other weekend in Michigan, and also directed Steven and the children to participate in reunification therapy every Tuesday and Thursday. Further, because of Julie's purported refusal to comply with the parenting time orders, Steven seeks an extended period of "makeup parenting time."

Federal Rule of Civil Procedure 15(d) states that a court may "permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." A supplemental pleading should be denied if "brought

in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile." Colvin v. Caruso, 605 F.3d 282, 294 (6th Cir. 2010) (quotation marks and citation omitted). These factors "are not exhaustive, allowing a court to ground its decision, within reason, on consideration of additional equities." Mullin v. Balicki, 875 F.3d 140, 149–150 (3d Cir. 2017).

Julie argues that Steven's proposed supplemental complaint asserting a claim for a right of access to the children would be futile because the Hague Convention does not grant federal courts jurisdiction to hear access claims. An examination of the case law surrounding this issue reveals a circuit split.

In support of her contention that this Court lacks jurisdiction to hear a right of access claim, Julie cites the Fourth Circuit's ruling in Cantor v. Cohen, 442 F.3d 196 (4th Cir. 2006). In that case, the parents were married in Israel and had four children. The couple later divorced in Israel and, after several modifications to their custody agreement, an Israeli court ruled that Ms. Cantor would have custody over the two daughters, while Mr. Cohen would have custody over the sons while he was stationed in Germany. The parties eventually agreed that the two daughters would live with Mr. Cohen in Germany for an extended period of time. When Mr. Cohen was transferred to Maryland, all four children went with him. Ms. Cantor subsequently filed a petition under the Hague Convention seeking return of the children and access to them. The United States District Court for the District of Maryland dismissed Ms. Cantor's access claim, ruling that it lacked jurisdiction to hear the claim.

On appeal, the Fourth Circuit began by examining the text of the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, et seq., the Hague Convention's implementing statute. Ms. Cantor cited § 9003(b) which states:

> Any person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action by filing a petition for relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.

Ms. Cantor noted the subsection's language permitting an individual to initiate judicial proceedings to secure rights of access, as well § 9003(e), which establishes a burden of proof for individuals seeking to secure rights of access.

The court instead began by looking at § 9001(a)(4), which states that ICARA is limited to implementing only those rights set forth in the Convention. Cantor, 442 F.3d at 199 ("The Convention . . . establishes legal rights and procedures for the prompt return of the children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights.") (quoting 22 U.S.C. § 9001(a)(4)); see also id. ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention . . . .") (quoting 22 U.S.C. § 9001(b)(4)).

The Court then turned to Article 21 of the Convention, the article addressing the right of access, which states that an application for access "may be presented to the Central Authorities of the Contracting States in the same way as an application for the return of a child." Id. at 200 (quoting Hague Convention, art. 21). The Central Authority of the United States is its Department of State. Id. The court also noted that "Article 21 of the Convention does not provide for presentation to a judicial authority. This is in sharp contrast to Article 12 of the Convention, which addresses wrongful removal or return claims, and specifically refers to the initiation of judicial proceedings." Id. The court also addressed ICARA's legislative history, which emphasized Congress's intent to keep federal courts from wading into custody matters. Finally, and most

pertinent to the present case, the court noted that while the articles addressing wrongful removal claims contain affirmative defenses (grave risk, maturity, and consent), there are no provisions in the Convention providing affirmative defenses to access claims. Importantly, the court posed the following question: "how would a federal court deal with a situation where it exercised jurisdiction over an access claim, yet the court could not consider the fact that a child's life may be in danger by the enforcement of an access right?" Id. at 204. Based on the foregoing, the Fourth Circuit affirmed dismissal of the access claim.

In support of his argument that the Convention provides for access claims, Steven cites to the Second Circuit's ruling in Ozaltin v. Ozaltin, 708 F.3d 355 (2d Cir. 2013), which expressly disagrees with Cantor. In Ozaltin, the parents were dual citizens of the United States and Turkey, primarily living in Turkey with their two minor children. After a domestic dispute, the mother moved to New York City with the children. The father eventually filed a Hague Petition in the Southern District of New York. In his petition, the father sought the return of the children to Turkey, and, pursuant to Article 21, an order enforcing the visitation rights granted to him by a Turkish family court. The district court granted the father's petition, ordering that the mother return the children to Turkey. The court also ruled that it had jurisdiction under § 9003(b) to consider the father's access claim and that the mother must comply with the visitation order entered by the Turkish court.

On appeal, the mother argued that federal courts lack jurisdiction to hear access claims. The Second Circuit began by noting that "[p]roperly framed, the Mother's argument is not jurisdictional in nature but instead goes to whether [§ 9003] creates a federal right of action." Id. at 371. The court then held that "[t]he statutory basis for a federal right of action to enforce access rights under the Hague Convention could hardly be clearer." Id. at 372. Like the petitioner in

Cantor, the court noted the language in § 9003(b) that "[a]ny person to initiate judicial proceedings under the Convention . . . for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action."  The court also cited § 9003(e), which establishes a burden of proof for those seeking to exercise access rights.

The court then turned to Article 21 of the Convention, noting that "[t]he Fourth Circuit interpreted Article 21 as stating that access rights can only be vindicated by applying to the State Department, which is the United States's designated 'Central Authority' under the Hague Convention."  Id. at 373.  The Second Circuit disagreed with this interpretation, stating that "Article 21, however, provides that efforts to secure rights of access 'may' be initiated through an application to a country's Central Authority, not that they 'may only' be pursued in this way."  Id.

The court also relied on Article 29 of the Convention, which states

> This Convention shall not preclude any person . . . who claims that there has been a breach of custody or access rights within the meaning of Article 3 or 21 from applying directly to the judicial or administrative authorities of a Contracting State, whether or not under the provisions of this Convention.

Id. (quoting Hague Convention, art. 29).  The court read this section to mean that applying to the State Department is a nonexclusive remedy for enforcing access rights.  The court also pointed to "the apparent lack of any administrative apparatus for enforcing access," noting that the State Department can only provide facilitative services, and does not have the authority to enforce access rights.  The court concluded by stating "[i]n sum, even though not required under Article 21, federal law in the United States provides an avenue for aggrieved parties to seek judicial relief directly in a federal district court or an appropriate state court."  Id. at 374.

The Sixth Circuit has addressed this issue, but only in passing.  In Taveras v. Taveraz, 477 F.3d 767 (6th Cir. 2007), the father brought suit under ICARA and the Alien Tort Statute seeking

return of the parties' children to the Dominican Republic.  The father did not raise a right of access claim.  In denying the father's claim for return under ICARA, the court stated in a footnote that "unlike The Hague Convention, the ICARA . . . does provide for judicial remedies for non-custodial parents, namely for rights of access claims (e.g., visitation)."  Id. at 777 n. 7.  Because this conclusion was reached without any explanation, and because it is dictum, it does not provide much guidance to the Court.

The Court declines to opine on whether the Convention and ICARA grant a judicially enforceable right of access.  In light of the extraordinary circumstances of this case, the Court chooses to exercise its discretion to decline Steven's request to file a supplemental complaint under Rule 15(d), even if a right of access is judicially enforceable and includes, as a general matter, enforcement of visitation orders from foreign courts.  See Schuckman v. Rubenstein, 164 F.2d 952, 958 (6th Cir. 1947) ("The granting or refusing of leave to file such a supplemental pleading rests in the discretion of the trial court, and is not reviewable unless there has been a gross abuse of such discretion."); Mullin, 875 F.3d at 149–150 (discretion may be exercised based on "consideration of . . . equities.").  In light of Steven's permanent relocation to Michigan, and the Court's corresponding refusal to order return, it is questionable, to say the least, whether the Mexican court would conclude that its orders should be enforced or whether it should continue to exercise jurisdiction regarding custody and visitation, even if it has the right to do so.

The Mexican court may well conclude that the best interests of the children will require close court supervision of the custody and visitation arrangements for the children.  Such intense supervision will be required based on the sad history of the past four years, in which Steven and Julie have been unable to negotiate their way to resolving the dissolution of their marriage, the division of their assets, or the custody and visitation arrangements for their children.  A reasonable

Mexican court may well recognize, as this Court has, that Steven has relocated to Michigan.[5]  It may also conclude that a local court in Michigan, where the family resides, will be better situated to referee the disputes that, unfortunately, appear to be the likely future for the Neumann family, unless a less adversarial approach to dispute resolution is adopted.  A local Michigan court can arrange conferences to meet with the children, the parents, and necessary professionals far more quickly and at a hugely reduced cost for the Neumann family than could a Mexican court situated 2,300 miles away.  And if orders must be issued, a local Michigan court will be far better positioned to assemble the necessary participants, conduct prompt hearings and effectively enforce orders against recalcitrant parents who are in close proximity to that local court.

A reasonable Mexican court would also likely reconsider enforcement of orders that were not fashioned based on the input of any mental health professional.  And it certainly would want to reconsider its orders in the light of a recent and extensive evaluation by an independent psychologist who opines strongly that visitation take place only <u>after</u> Steven and the children undergo therapy.  Specifically, Dr. Haynes recommended that parenting time for Steven await satisfaction of two "pre-conditions": (i) "Steve Neumann committing to work in a  significant outpatient substance abuse treatment program"; and (ii) "Therapeutic work with a Licensed Mental Health Professional regarding reunification would be the second precondition to parenting time being directly explored and attempted."  Dr. Haynes Report at 28.  Dr. Haynes explained how Steven's commitment to substance abuse treatment is critical to repairing the relationship with his children:

> It is recommended that Steve enroll in and commit to an outpatient
> substance abuse treatment program, such as offered by Maplegrove

---

[5] The Mexican court orders, issued in April 2017, post-date Steven's relocation to Michigan in November 2016.  However, the orders make no mention of his relocation, and the parties' briefing in this Court does not address this. Thus there is nothing to indicate that the Mexican court had knowledge of Steven's relocation when it issued the orders.

> outpatient. This is essential. He needs to begin to explore what is motivating him to binge with alcohol resulting in serious detrimental effects, and to break that cycle. That good faith effort also may help motivate his children to develop and resume a relationship with him.

Id. at 27. Dr. Haynes also explained how critical family reunification therapy is for establishing the groundwork for resumption of contact with Steven:

> In this process, the children also should have the opportunity to consult with the mental health professional individually. The recommendation of that professional whether resumption of parenting time was ready would be important part of the precondition. An updated re-evaluation by an independent psychologist also may be desirable at that time prior to resumption of parenting time, if that looks feasible.

Id. Dr. Haynes's opinions are certainly matters the Mexican court would want to take into account.

In light of the foregoing, it would not be prudent to enforce existing Mexican court orders, even if Steven has a right of access that is judicially enforceable. Steven's relocation to Michigan and a mental health professional's opinion about how parenting time should be assessed and structured raise significant doubts that the issuing court would want its orders enforced, as currently framed, or even continue to exercise jurisdiction — assuming it believes it still has continuing jurisdiction over custody and visitation. Sound discretion compels the conclusion that such issues should be taken up with the Mexican and/or Michigan courts.[6]

As a result, the Court declines to allow Steven to file a supplemental complaint asserting an access claim.

---

[6] The Court's decision not to entertain Steven's right of access claim does not leave the parties without avenues to resolve custody and visitation issues. The forum for such relief lies in other courts. For example, Michigan law provides a pathway for the Mexican court to relinquish jurisdiction in favor of Michigan, based on Michigan being the more appropriate and convenient forum. See Mich. Comp. Laws § 722.1201(1)(b); Mich. Comp. Laws § 722.1203(a)-(b). Alternatively, foreign court orders may be enforced in Michigan courts. See Mich. Comp. Laws § 722.1303.

**D. Dr. Haynes's Fee**

Finally, the Court addresses payment of Dr. Haynes's fee. In the November 13, 2017 order appointing Dr. Haynes, the Court stated that "[f]or reasons set out in a separate order to be entered, Petitioner shall initially be responsible for Dr. Haynes's fees." 11/13/2017 Order at 3 (Dkt. 111). The Court now explains its reasoning. On October 23, 2017, the Court addressed claims by both parties that they were unable to afford Dr. Haynes's services. To substantiate these claims, the Court ordered the parties to produce various financials, including tax returns and bank statements. See 10/23/2017 Order at 2 (Dkt. 104). After review of this information, the Court concluded that, despite the significant amount he has expended on this case, Steven was in a better position to afford Dr. Haynes's fee upfront than Julie. However, the Court orders that Steven is entitled to recoup half of the fee at such time as there is a consensual or court-ordered division of assets in future proceedings between Steven and Julie.

### III. CONCLUSION

For the foregoing reasons, the Court denies Steven's petition for return of the children under the Hague Convention (Dkt. 1) and his motion to file a supplemental complaint and for other emergency relief (Dkt. 88).

SO ORDERED.

Dated: February 23, 2018          s/Mark A. Goldsmith
    Detroit, Michigan          MARK A. GOLDSMITH
                          United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 23, 2018.

                        s/Karri Sandusky
                        Case Manager